Eugene SATTERWHITE,
Plaintiff-Appellee,

and

Frank J. Howard, Ray E. Meeks, and
John W. Smith, Plaintiffs-Appellants,

v.

Richard Dale SMITH and Jane Doe
Smith, his wife; Jack A. Fabulich and
Jane Doe Fabulich, his wife; Robert G.
Earley and Jane Doe Earley, his wife;
S. Reed Jones and Jane Doe Jones, his
wife; William Ross and Jane Doe Ross,
his wife; and the Port of Tacoma, De-
fendants-Cross Appellants.

Nos. 83–3668, 83–3692.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 5, 1984.

Decided Oct. 10, 1984.

Clair Mancini, Gerald L. Hulscher, Do-
lack, Hansler, Hulscher, Burrows, Dayhoff
& Barline, Tacoma, Wash., for plaintiffs-ap-
pellants.

Jocelyn J. Lyman, Bergman & Bauer,
Seattle, Wash., James J. Mason, Tacoma,
Wash., for plaintiff-appellee.

Before WRIGHT, Senior Circuit Judge,
and PREGERSON and CANBY, Circuit
Judges.

PREGERSON, Circuit Judge:

Four black men—Frank Howard, Ray Meeks, John Smith, and Eugene Satterwhite—sued the Port of Tacoma and several of its officers for violating their civil rights under 42 U.S.C. §§ 1981, 1983, & 1985(3) (1982). After conducting a full trial on the merits, the United States District Court for the Western District of Washington dismissed the claims of Howard, Meeks, and Smith, but ruled that the Port had violated § 1981 by discriminating against Satterwhite. The court awarded Satterwhite back pay, damages, prejudgment interest, and attorney's fees. From the judgments against them, Howard, Meeks, and Smith now appeal and assign numerous errors. The Port cross-appeals from the judgment in favor of Satterwhite.

For the reasons that the district court expressed, *see Howard v. Smith*, Civ. No. 80–492T (W.D.Wash. Dec. 30, 1982) (findings of fact and conclusions of law), we affirm each judgment. We write further only to analyze the constructive discharge issue in Satterwhite's case and to correct a minor error in his back pay award.

## A. *Constructive Discharge*

1. *Background.* Eugene Satterwhite worked for the Port as a casual employee on the sweeper crew from July 1979 to January 1980. A casual sweeper fills in whenever a permanent employee is absent from work. Satterwhite says that when the Port hired him, it represented that he would get a permanent appointment, based on seniority, when an opening became available.

The district court found that the sweeper crew served as an important entry-level position. The Port cross-trained sweepers both on the job and in separate classes for work on the railroad switch crew pursuant to company policy and the collective bargaining agreement.

Satterwhite complains that the Port failed to promote him to the permanent sweeper crew because of his race.

The district court agreed. The court found that the Port never interviewed Satterwhite for the position but regularly interviewed and hired white men. Sometimes his supervisor even assigned Satterwhite to break in and train these men. The court also found that the Port's purported reason for passing over Satterwhite—that he lacked railroad experience—was simply a pretext for discrimination. This "experience" consisted of nothing more than the physical ability to get on and off moving rail cars. In fact, the Port did not list railroad experience as a qualification when it posted job openings.

■ 2. *Satterwhite's discharge.* Satterwhite was not fired; instead, he resigned. He argues that he quit when he became convinced that the Port would never promote him to permanent status. Without explicitly saying so, the district court apparently treated his resignation as a constructive discharge, and the Port challenges this finding.[1]

■ Even though the district court did not make an explicit finding, we may determine the issue for ourselves because the comprehensive record before us on appeal provides the basis for our "complete understanding" of the matter. *Swanson v. Levy*, 509 F.2d 859, 861 (9th Cir.1975), *followed in Clark v. Marsh*, 665 F.2d 1168, 1172 (D.C.Cir.1981).

■ To determine whether Satterwhite was constructively discharged on the basis of his race, we must find that a reasonable person in his position would have felt that he was forced to quit because of intolerable and discriminatory working conditions. *Nolan v. Cleland*, 686 F.2d 806, 813–14 (9th Cir.1982); *Heagney v. University of Washington*, 642 F.2d 1157, 1166 (9th Cir.1981). But courts which have considered the question are reluctant to predicate

---

**1.** An employee who quits cannot secure backpay unless his employer constructively discharged him. *E.g., Muller v. United States Steel Corp.,* 509 F.2d 923, 930 (10th Cir.), *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975).

a finding of constructive discharge solely on the fact of employment discrimination. *See Clark v. Marsh*, 665 F.2d at 1173 (discussing authorities). Instead, they look for "aggravating factors," such as a "continuous pattern of discriminatory treatment." *Id.* at 1174. [2] As a result, the answer turns on the facts of each case.

In *Muller v. United States Steel Corp.*, 509 F.2d 923 (10th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975), the employer refused to consider plaintiff, an employee of "Spanish-American origin," *id.* at 924, for the position of spell foreman and assigned him to an area of the plant that made it impossible for him ever to become spell foreman. The Tenth Circuit held that the employer's conduct did not create the requisite intolerable conditions.

Later, in *Irving v. Dubuque Packing Co.*, 689 F.2d 170 (10th Cir.1982), the same court implied that plaintiff, who presented weak evidence of intolerable conditions, was not constructively discharged, even though he had been discriminatorily denied a promotion. The court relied in part on the facts that the manager had passed over white as well as black employees, and that he had verbally abused "everybody," not just plaintiff. *Id.* at 174.

But in *Clark v. Marsh*, 665 F.2d 1168 (D.C.Cir.1981), the District of Columbia Circuit considered the case of a well-qualified black woman who resigned from civilian employment in the Army. The woman joined the Army's special career advancement program. For many years afterward, she sought promotions, transfers, and skills training opportunities. In 11 years the Army promoted her only once. She filed administrative complaints but got no results. Eventually, she quit when the Army embarrassed her by passing over her and filling a supervisory position with a recent law school graduate—even though plaintiff had competently served in that post herself on an interim basis for over a year. The court concluded that she had been constructively discharged.

Finally, in *Nolan v. Cleland*, 686 F.2d 806 (9th Cir.1982), we reversed a summary judgment against an employee who had resigned. We held that she had raised a genuine issue of constructive discharge even though the circumstances in her case were not as extreme as those in the cases discussed above.[3] In *Nolan*, the Veterans Administration initially rejected plaintiff for a special graduate education program. Then a VA official refused to provide Nolan with a necessary evaluation of her work for the program. Later, another VA official provided an inaccurate evaluation. And, as a last straw, the VA assigned her to an out-of-town position she had not requested—even though the VA ordinarily assigned applicants to that particular position only if they asked for it. Plaintiff quit when she concluded that discriminatory working conditions at the VA would remain intolerable. We remanded for trial on whether the conditions would have forced a reasonable person in plaintiff's position to quit.

We think Satterwhite's case is more like *Nolan* or *Clark v. Marsh* than either *Muller* or *Irving*. There are at least two reasons.

---

2. For example, a court may find a constructive discharge when the employer's act of discrimination consisted of continually subjecting his employee to racial insults. *Cf., e.g., Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir.1977) (per curiam) (extremely offensive derogatory comments could themselves constitute unlawful employment practice); *Reichman v. Bureau of Affirmative Action*, 536 F.Supp. 1149, 1176 (M.D.Pa.1982) (same).

3. We recently considered the constructive discharge doctrine in an analagous, non-employment discrimination case. In *Lojek v. Thomas*, 716 F.2d 675 (9th Cir.1983), plaintiff sued his former law firm and challenged the forfeiture of his pension benefits. After refusing to sign both the firm's new stock purchase-and-redemption agreement and its new stockholders' agreement, plaintiff had quit. Relying on *Nolan*, we held that plaintiff's mere disagreement with changes in his terms of employment did not constitute constructive discharge. *Lojek*, 716 F.2d at 683.

First, the Tenth Circuit cases, in describing the proper test for determining whether the employee was constructively discharged, use language that focuses on the employer's subjective intent, rather than on the reasonable employee's perspective. *See Muller,* 509 F.2d at 929 (constructive discharge exists "when an employer *deliberately* renders the employee's working conditions intolerable" (emphasis added)); *Irving,* 689 F.2d at 172 ("employer's actions must be *intended* by the employer as an effort to force the employee to quit" (emphasis added)).[4] This view is out of step with both the weight of authority and the law of our Circuit. *See Nolan,* 686 F.2d at 814 n. 17; *see also Lojek v. Thomas,* 716 F.2d 675, 681 (9th Cir.1983) (discussing authorities).

 Second, the record demonstrates that Satterwhite faced very poor working conditions. For example, he could not obtain a promotion to the permanent sweeper crew.. This prevented him from gaining access to training and advancement opportunities that the Port had promised. Moreover, the Port regularly promoted white men ahead of him. Sometimes Satterwhite even had to train these men, a situation he found embarrassing and humiliating. Furthermore, the reason the Port offered for denying Satterwhite a promotion—that he lacked railroad experience—turned out to be a pretext for discriminating against him because he was black. Finally, his supervisor relegated him to working a disproportionate share of time in the rope room, where he was assigned the dull task of tying ropes. From this post, Satterwhite had virtually no hope of securing the opportunities for career advancement that white men on the permanent sweeper crew had. Instead, he was doomed to remain a temporary employee.

In light of these facts, as well as the atmosphere of occasional racial insults that all blacks working at the Port suffered, we conclude that the district court did not err in assuming that conditions at the Port were intolerable and discriminatory.

### B. *Back Pay Award*

 The Port contends that the district court arbitrarily gave Satterwhite $5,000 more than he asked for. At the court's request, plaintiffs' counsel calculated Satterwhite's back pay at $94,660.74 and his prejudgment interest at $13,440.71. But the court gave Satterwhite $99,660.74, plus the same sum, $13,440.71, in prejudgment interest.

Because the court had no basis in the record for awarding an extra $5,000, we reduce the award by that amount.

As so modified, the judgment is AFFIRMED.

---

4. The state of the law in the Tenth Circuit on this subject is confusing. Other language in the cases purports to embrace the reasonable employee standard *as well as* the employer's-subjective-intent standard. *See, e.g., Irving,* 689 F.2d at 172 ("A finding of constructive discharge depends upon whether a reasonable man would view the working conditions as intolerable ....").