**Dale H. JURGENS, et al., Plaintiffs,**

v.

**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION,
Defendant–Appellee,**

v.

**Jules H. GORDON, Plaintiff–Appellant.**

No. 89–1386.

United States Court of Appeals,
Fifth Circuit.

June 19, 1990.

**19.** *Thigpen v. Locke,* 363 S.W.2d 247, 253 (Tex. 1962); *Lovell,* 754 S.W.2d at 303 (Tex.Civ.App. 1988).

Jeffrey Clair, Dept. of Justice, Civ. Div., Washington, D.C., for defendant-appellee.

Before KING, GARWOOD, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

This appeal arises from an employment discrimination action filed by a class of white male employees of the Equal Employment Opportunity Commission (EEOC) in 1976. In 1982, the district court ruled in favor of the plaintiff class, finding that, beginning in 1974, the EEOC had engaged in a pattern of discrimination in violation of title VII of the Civil Rights Act of 1964 in making certain personnel decisions. *See Jurgens v. Thomas,* 29 Fair Empl. Prac. Cas. (BNA) 1561, 1982 WL 409 (N.D.Tex. 1982). The court subsequently appointed special masters to conduct hearings and make recommendations with respect to individual class members' claims for relief. In so doing, the court clarified,

> Awards of back pay, as appropriate to eligible claimants who have left EEOC, shall run at least through the date of termination of employment. To obtain back pay or other relief for any period of time following his termination or resignation, a claimant must establish a 'nexus' between his termination or resignation and the discriminatory non-selection at issue.

Jules H. Gordon, a member of the plaintiff class, pursuant to methods specified by the district court, brought his case before a special master in order to gain relief.

I.

In November 1975, the EEOC promoted an Hispanic male, instead of Gordon, from the position of Assistant Regional Attorney (ARA) at the EEOC's San Francisco Regional Litigation Center to the position of Regional Attorney (RA). Gordon, who was then forty-nine years old, expected to continue to work for the EEOC in such a managerial role until the normal retirement

Jules H. Gordon, Oakland, Cal., pro se.

age of sixty years, when he would be eligible for a "full" annuity.

As an ARA in October 1978, Gordon was a grade GS–15 employee with an annual salary of $45,792 and set the legal policies and trial strategies for the cases handled by approximately seven to twelve attorneys. At this time, the EEOC began reorganizing its field offices and reducing its forces. The EEOC abolished the position of ARA but retained that of RA, though reduced in grade from a GS–16 to a GS–15 and assigned managerial responsibilities substantially equivalent to those of the former ARA.

As a part of this reorganization, the EEOC offered Gordon the choice of accepting (i) a demotion to the position of Supervisory Trial Attorney (STA), a non-management GS–14 position with supervision over only three to five attorneys, or (ii) an early retirement with a reduced annuity of approximately $15,000 per year. The EEOC did not offer Gordon any of the new management positions that were created in other field offices. Perceiving no other acceptable options at that time, Gordon felt compelled to accept the EEOC's latter option, effective January 27, 1979, and to develop a practice as a private labor arbitrator. Gordon felt that it would be degrading to accept the demotion to the position of STA and that, in light of the apparent pattern of EEOC's discrimination against white males, there was no chance of his being promoted to a GS–15 managerial position.

Following an evidentiary hearing, the special master ultimately made the following recommendations, which the district court accepted with only a few slight modifications: (1) finding that the EEOC had discriminated against Gordon in denying him the 1975 promotion to RA; (2) awarding back pay from the time of the denial of the promotion until the effective date of his retirement; and (3) granting partial summary judgment against Gordon by refusing to award any back pay to compensate him for lost wages beyond the effective date of

his retirement. The EEOC does not dispute the first two recommendations, but Gordon appeals the third.[1]

## II.

### A.

In reviewing a summary judgment, we apply the same standard as the district court, *Waltman v. International Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989), and ask whether the pleadings, depositions, and answers to interrogatories, together with the affidavits, demonstrate that no genuine issue of material fact remains and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In making that determination, we must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). Accordingly, we view the evidence most favorably to Gordon. The EEOC, however, does not challenge the essential facts as alleged by Gordon but simply disputes the applicable law.

### B.

Gordon challenges the special master's ruling that, where an employer's discriminatory denial of a promotion ultimately results in a demotion that precipitates the employee's retirement (even though that demotion occurred as part of an intervening nondiscriminatory reduction in force), the employee, in order to receive back pay compensation for any time after his retirement, must still show (i) that his retirement was the result of objectively intolerable working conditions constituting a constructive discharge and (ii) that there is a sufficient nexus or causal link between the denial and the employee's subsequent resignation—i.e., that at the time of the denial, the employer reasonably could have foreseen that the employee would face such intolerable conditions forcing him to resign.

---

1. As Gordon's appeal does not raise issues pertaining to other class members, we grant the

EEOC's request for voluntary dismissal of its cross-appeal.

Although Gordon does not contend that the EEOC acted in a discriminatory fashion with respect to its 1978–79 reorganization, he argues that, "but for" the EEOC's discriminatory denial of his promotion to the GS–16 RA position in 1975, he would not have been compelled to retire in 1979 because, at worst, he would have been demoted to the new GS–15 RA position.

■ In support of his contention that the law does not require him to show constructive discharge, Gordon cites a number of cases from other jurisdictions that, according to Gordon, suggest that the relevant inquiry is whether Gordon properly mitigated his damages by accepting early retirement, not whether he was constructively discharged.[2] However, it is well settled in this circuit that, in order for an employee to recover back pay for lost wages beyond the date of his retirement or resignation, the evidence must establish that the employer constructively discharged the employee. *See Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61, 65–66 & n. 8 (5th Cir. 1980).[3]

■ We find no inconsistency in determining entitlement to such back pay, in some cases, by whether the employee properly mitigated damages after his retirement or resignation, and in other cases, involving denial of promotion, by whether the employee was constructively discharged. We simply hold, as we did in *Bourque,* that where an employer discriminatorily denies promotion to an employee, that employee's duty to mitigate damages encompasses remaining on the job.[4] *See*

**2.** We note that Gordon presents, at most, two circuit cases that colorably support his contention, i.e., *DiSalvo v. Chamber of Commerce,* 568 F.2d 593, 597 (8th Cir.1978), and *Wells v. North Carolina Bd. of Alcoholic Control,* 714 F.2d 340, 342 (4th Cir.1983), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 712, 79 L.Ed.2d 176 (1984). To the extent that *DiSalvo* suggested that back pay could be recovered for any period following a voluntary resignation, this is apparently no longer the position of the Eighth Circuit; in *Maney v. Brinkley Mun. Waterworks & Sewer Dep't,* 802 F.2d 1073, 1075 (8th Cir.1986), the court stated, "As a general rule, employees are entitled to awards such as back pay and reinstatement only if they were actually or constructively discharged from their employment." *See also Major v. Rosenberg,* 877 F.2d 694, 695 (8th Cir.1989). While the *Wells* court explicitly declined to decide whether a constructive discharge had occurred and instead based its decision upon whether the employee properly mitigated his damages, the court then found that Wells's back injury made his mitigation of damages by continuing his heavy lifting work unnecessary. *Wells* thus presents an exceptional circumstance in that the employee who was discriminatorily denied promotion subsequently developed a condition that made his continuing in his same job station an extreme hardship. Under such circumstances, of course the objective reasonable-employee constructive discharge standard arguably must be modified to take into account the peculiar disabilities of the employee.

**3.** In *Bourque,* a female employee brought a sex discrimination claim under title VII against her employer. Although she received a promotion that she had requested, her employer discriminated against her by refusing to provide her equal pay for equal work. After a 90–day trial period in her new position, she received a wage increase, but it was still significantly below that which she requested and far less than that being paid to comparable male employees. As a result, she resigned. Concluding as a matter of law that the evidence did not establish a constructive discharge, *see* 617 F.2d at 64, we found no error in the district court's refusal to award any damages beyond the date on which she resigned. *See id.* at 66 n. 8. More specifically, we held that a reasonable employee would not have felt compelled to resign merely because of disappointment at not receiving an expected raise. *See id.* at 65.

**4.** We do not view the *Bourque* rule making a finding of constructive discharge a prerequisite to back pay for periods following retirement or resignation to be contrary to the subsequent decision in *Ford Motor Co. v. EEOC,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982), where the Court stated,

An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g). This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, *accept a demotion,* or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied. [Footnotes omitted, emphasis added.]

We find the instant case beyond the reach of the above pronouncement for two reasons. First, the Court's statement referred to persons not in an existing employment relationship with the discriminating employer, and thus none of the *Bourque* rationale for combatting discrimina-

*Bourque, id.* at 66 ("Certainly unlawful discrimination in the form of unequal pay is relevant in any determination of whether constructive discharge has occurred.... We think that unequal pay alone does not constitute such an aggravated situation that a reasonable employee would be forced to resign. Unequal pay is not a sufficient justification to relieve Ms. Bourque of her duty to mitigate damages by remaining on the job.").[5]

## C.

■ Thus, we now consider whether Gordon was constructively discharged. In *Bourque,* we enunciated the constructive discharge standard:

The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee.

617 F.2d at 65 (quoting *Young v. Southwestern Sav. & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975)). We specifically endorsed a reasonable-employee test: "To find constructive discharge we believe that 'the trier of fact must be satisfied that the ... working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)).

Proof is not required that the employer imposed these intolerable working conditions with the specific intent to force the employee to resign. *See id.* at 65 & n. 5 (acknowledging that a number of other circuits have endorsed such a strict standard). Finally, we noted that our constructive discharge standard supports the purposes of title VII:

[Plaintiff] contends, however, that to require employees suffering illegal discrimination to seek legal redress while remaining in their jobs would contravene the policies served by title VII because then only 'foolhardy' victims would seek relief from discrimination. We disagree. Title VII itself accords legal protection to employees who oppose unlawful discrimination. Moreover, we believe that society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships.

*Id.* at 65–66 (citation and footnote omitted).

■ In cases subsequent to *Bourque,* we explicitly have placed the burden on the employee to prove constructive discharge. *See Downey v. Southern Natural Gas Co.,* 649 F.2d 302, 305 (5th Cir. Unit B Jun. 1981).[6] We note that in general,

[o]nce a plaintiff in a Title VII case has established a prima facie case and established what he or she contends to be the damages resulting from the discriminatory acts of the employer, the burden of producing further evidence on the question of damages in order to establish the

tion within the confines of the workplace applies. Second, the demotion of the instant case was non-discriminatory; only the denial of promotion was found to be discriminatory.

**5.** Other courts have agreed that in order to be eligible for back pay compensation for lost wages beyond the end of the employment period, the employee must have been actually or constructively discharged by the employer. *See Maney,* 802 F.2d at 1075; *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 342 (10th Cir.1986); *Satterwhite v. Smith,* 744 F.2d 1380, 1381 n. 1 (9th Cir.1984); *Harrington v. Vandalia–Butler Bd. of Educ.,* 585 F.2d 192, 197 (6th Cir.1978), *cert. denied,* 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979);

*but see DiSalvo; Wells; but cf. Thorne v. City of El Segundo,* 802 F.2d 1131, 1136 & n. 4 (9th Cir.1986) ("Because the termination date for backpay awards in Title VII cases is peculiarly dependent upon each case's unique facts, we note that even in cases involving an employer's refusal to promote, courts do not apply the backpay limitation rotely.") (citations omitted.).

**6.** *See also Wood v. Carboline Co.,* 736 F.2d 301, 302–03 (5th Cir.1984) (affirming, as proper, district court's jury instructions that expressly placed the burden of proving constructive discharge on the employee where the challenge to those instructions was on other grounds).

amount of interim earnings or lack of diligence properly falls to the defendant. *Marks v. Prattco, Inc.*, 633 F.2d 1122, 1125 (5th Cir. Unit A Jan.1981). However, because under *Bourque* an employee who resigns in response to a discriminatory denial of promotion is presumed to have mitigated damages insufficiently, the burden to prove constructive discharge will revert to the resigning employee.

### D.

■ A review of the specific facts of the instant case leads us to conclude that our finding, on substantially similar facts, of no constructive discharge as a matter of law in *Jett v. Dallas Indep. School Dist.*, 798 F.2d 748 (5th Cir.1986), *modified on other grounds*, —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), should control the disposition of the case now before us. In *Jett* we stated the following:

> Jett [a high school teacher] tendered his resignation on August 19, 1983, stating that, after considering his assignment to Thomas Jefferson High School, he could not accept the position and felt 'forced to resign from the public education field with much sorrow and humiliation.' Jett argues that his significant loss in coaching responsibilities as well as the racial discrimination and the retaliation for his protected speech that prompted his reassignment amounted to a constructive discharge.
>
> Although a demotion or transfer in some instances may constitute a constructive discharge, we find that Jett's loss of coaching responsibilities was not so intolerable that a reasonable person would have felt compelled to resign. We have noted that constructive discharge cannot be based upon the employee's subjective preference for one position over another.... [W]e believe that Jett's new working conditions simply were not so difficult or so unpleasant that he had no choice but to resign. Moreover, the humiliation and embarrassment that Jett suffered are not significant enough to support a constructive termination.
>
> ... For example, we have held that unlawful discrimination in the form of unequal pay may be relevant to a determination of constructive discharge, but alone cannot constitute such an aggravated situation that a reasonable employee would feel forced to resign. Jett has not shown any racial discrimination or free speech violations (or likelihood or threats thereof) subsequent to March 1983 that would constitute intolerable working conditions. Significantly, Jett resigned in August 1983 after receiving his assignment for the 1983–1984 school year, but did not resign in March 1983 after the reassignment that he claims violated his equal protection and free speech rights. We conclude that Jett was not constructively terminated from his employment with the DISD.

*Id.* at 755–56 (citations omitted).[7]

In light of the foregoing, we examine whether the special master properly found that the facts as alleged by Gordon are

---

7. In *Kelleher v. Flawn*, 761 F.2d 1079, 1086–87 (5th Cir.1985), we held that the employer's reassignment of plaintiff lecturer to a nonteaching position, in light of the subsequent reassignment of all other graduate student assistant instructors to nonteaching positions, was not a constructive discharge. Gordon attempts to distinguish his case by noting that the employee in *Kelleher* was reassigned because of her speech amounting to insubordination. Although emphasizing this fact in rejecting the employee's first amendment claim in *Kelleher, id.* at 1084–85, we did not mention it as a factor in our constructive-discharge analysis relating to her procedural due process claim. *See id.* at 1086–87.

Gordon thus had a much better case (in fact a victorious one) than Kelleher as to proving initial discrimination. However, Gordon's evidence as to constructive discharge was only comparable to Kelleher's. *See generally* 3 A. Larson & L. Larson, *Employment Discrimination* § 86.50, at 17–62 (1989) ("Claims of constructive discharge have generally not succeeded in cases where they are based on ... denial of promotion...."); B. Schlei & P. Grossman, *Employment Discrimination Law* 1433 (2d ed. 1983) ("In a promotion or other case where the plaintiff continues in the defendant's employ, the period of liability will end if the plaintiff voluntarily resigns.") and *id.* at 1433 n. 40 ("The termination of back pay in such circumstances is, of course, dependent on there being no finding of constructive discharge.") (citations omitted).

insufficient to support a finding of constructive discharge. First, the master noted that Gordon does not allege that the EEOC denied him the RA promotion in 1975 in order to stigmatize or demean him. Like Jett, Gordon also does not allege that his employer harassed him in any manner following the promotion denial. Gordon felt compelled to accept early retirement in 1979 primarily because he wanted to avoid the degradation of being demoted to a non-management position after holding a management position with the EEOC for nine years.

Similarly, Jett alleged that the humiliation of being transferred to another school and removed from the posts of head coach and athletic director, positions he had held for thirteen years, compelled him to resign. Just as in *Jett,* a slight decrease in pay coupled with some loss of supervisory responsibilities is insufficient to constitute a constructive discharge of Gordon.

We find it unnecessary to address the EEOC's attenuation argument, because we hold that even if we assume that Gordon's ultimately being offered only a GS–14 STA position rather than a GS–15 RA position was a direct consequence of unlawful discrimination, this still would not have amounted to a constructive discharge. Significantly, neither the discriminatory denial of promotion nor the non-discriminatory demotion was "a harbinger of his dismissal," *see Junior v. Texaco, Inc.,* 688 F.2d 377, 380 (5th Cir.1982); nor was renewed advancement in the EEOC necessarily unexpected.[8]

Moreover, although it may well be true that Gordon would not have been demoted to the GS–14 STA position but for the earlier discriminatory denial of promotion, most of the humiliation and embarrassment that might ordinarily accompany a demotion were necessarily absent in Gordon's case, because the demotion was part of a *non-discriminatory* reorganization. In fact, one of the other ARA's in the San Francisco office whose position was also abolished did not feel compelled to resign when demoted.

■ We find no support in the case law for the proposition that a simple discriminatory denial of promotion that cannot be reasonably construed as a career-ending action can alone create such embarrassment or humiliation that the denial comprises a constructive discharge. As the special master found, the STA position, though subjectively undesirable to Gordon, was not inherently demeaning, especially when it was offered as part of a comprehensive, racially neutral reorganization.

■ Gordon claims, though, that his compulsion to resign was aggravated by the unlikeliness of his being promoted back to a management position in light of the EEOC's pattern of discrimination against white males through July 1983. The special master recognized that the permanence of Gordon's demotion is a factor to consider under the constructive discharge analysis but found that Gordon's expectation of future discrimination in promotion involved a highly speculative forecast and, therefore, was not an aggravating factor. The master explained, "That expectation assumes that a GS–15 job would open, that Mr. Gordon would in fact be the most qualified candidate, and that EEOC would discriminate against him and select someone else."

We agree that as a matter of law such a remote possibility[9] would not make a rea-

---

8. This important factor distinguishes the instant case from *Hopkins v. Price Waterhouse,* 825 F.2d 458 (D.C.Cir.1987), *rev'd on other grounds,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

9. Although the EEOC was found to have engaged in a pattern of discrimination against white males through July 1983, Gordon does not contend, and the EEOC does not concede, that it was customary for those in EEOC's management positions who had been demoted to non-management positions during the 1978–79 reor-

ganization to view those demotions as career-ending decisions and, therefore, to retire or resign. If anything, the evidence indicates otherwise. Finally, Gordon did not resign because of his employer's discriminatory denial of his application for the RA promotion or because of the dim possibility of his being subsequently promoted to that position. Instead, he resigned because of his demotion, as part of a non-discriminatory reorganization, from the ARA management position he had held before and for three years after the denial of promotion.

sonable employee feel compelled to resign. Indeed, in virtually all cases in which there is a discriminatory denial of promotion, the reasonable employee will feel that his chances of advancement in his job are less than they would have been absent the discrimination. However, without continuing harassment or repeated discriminatory impediment to any advance as in *Calcote v. Texas Educ. Found.*, 578 F.2d 95, 96–97 (5th Cir.1978), dimmed future job prospects based upon the employer's past discrimination in promotions are not alone enough to support a finding of constructive discharge. *See Maney*, 802 F.2d at 1075–76; *see also Pittman v. Hattiesburg Mun. Separate School Dist.*, 644 F.2d 1071, 1077 (5th Cir. Unit A May 1981) (employee must show aggravating factors, aside from underlying discriminatory act, to establish constructive discharge[10]); B. Schlei & P. Grossman, *supra* note 7, at 268 & n. 44 (2d ed. Supp. 1989) (same). In light of these facts, the special master and the district court did not err in finding that, under the circumstances as alleged by Gordon, a reasonable employee would not have felt compelled to resign.[11]

AFFIRMED.

---

**10.** *See also* Note, *Choosing a Standard for Constructive Discharge in the Title VII Litigation,* 71 Cornell L.Rev. 587, 609–10 (1987). Aggravating factors include hostile working conditions and any other evidence suggesting any invidious intent on the part of the employer in creating or perpetuating the intolerable conditions compelling retirement or resignation. *See Pittman,* 644 F.2d at 1077. Thus, although we have adopted a reasonable-employee analysis, manifestations of the apparent intent of the employer are relevant to this analysis. *See Note, supra,* at 606–07.

**11.** As it is the law of this circuit that a finding of constructive discharge is imperative to any re-

covery of back pay for the period following resignation or retirement, we need not discuss either whether the "nexus" requirement enunciated by the district court has been met in the instant case or whether the special master properly exposited that requirement. Any "nexus" requirement is in addition to, rather than in substitution for, the constructive discharge requirement; any error by the master in utilizing a reasonable-foreseeability standard is harmless in light of the alternative finding that the facts as alleged by Gordon do not establish constructive discharge.