Nancy O'Mara **EZOLD**

v.

**WOLF, BLOCK, SCHORR AND SOLIS–COHEN.**

**Civ. A. No. 90–0002.**

United States District Court, E.D. Pennsylvania.

March 15, 1991.

Judith P. Vladeck, New York City, for plaintiff.

Mark S. Dichter, Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

On November 27, 1990, this court held that the defendant law firm, Wolf, Block,

Schorr and Solis–Cohen, had violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, by considering the gender of the plaintiff, Nancy Ezold, in its decision not to admit her to the partnership. 751 F.Supp. 1175. This court also held however that Ms. Ezold was not constructively discharged by virtue of the adverse partnership decision. As the parties had agreed prior to trial to bifurcate the issues of liability and damages, the issue of appropriate damages is now before the court.

In compliance with the court's request, the parties have submitted memoranda as well as replies addressing the scope of relief available to Ms. Ezold in light of her having prevailed on the Title VII liability issue. Ms. Ezold asserts that she is entitled to backpay as well as instatement as a partner in the firm. In the event that instatement as a member of the firm were deemed impractical, Ms. Ezold asserts that front pay is appropriate. In response Wolf, Block asserts that because the court held that Ms. Ezold was not constructively discharged by virtue of the defendant's adverse partnership decision, her relief for the Title VII violation is limited to back pay covering the period between the date her unlawfully denied partnership would have become effective, February 1, 1989, and the date she resigned her associate position with the Firm on June 7, 1989.

For reasons stated more fully below, I will not limit the scope of damages to back pay only up to the date of the plaintiff's resignation from the defendant firm. The appropriate relief within the scope of Title VII here may include back pay up the date of judgment and instatement as a member of the firm or, alternatively, front pay. Trial before this court on the issue of damages should thus address those remedies as well as the plaintiff's duty of mitigation under Title VII.

## SUMMARY OF FACTS

A brief review of the facts of this case is appropriate. The plaintiff, Nancy Ezold, was hired by the defendant law firm, Wolf, Block, as an associate on partnership track basis in 1983 and was assigned to the Firm's Litigation Department. Ms. Ezold had previously worked as an associate with small law firms for a period of three years. Wolf, Block is a Philadelphia-based firm comprised of approximately 250 attorneys, approximately half of whom are partners. Throughout Ms. Ezold's nearly six-year tenure as an associate at the Firm, which ended with her resignation on June 7, 1989, she became aware of signs that the Firm was treating her in a gender-discriminatory manner.

During her 1983 hiring interviews, Ms. Ezold was told by the then Chairman of the Litigation Department, Mr. Kurland, that it would not be easy for her at Wolf, Block because she was a woman, was not from an Ivy League law school (Ms. Ezold is a graduate of Villanova Law School), and was not on Law Review. During her time as an associate at the Firm, Ms. Ezold worked for partners in the Litigation Department on criminal matters, insurance cases, general commercial litigation and other areas. Ms. Ezold was primarily assigned cases that were small by Wolf, Block standards. Ms. Ezold did not work for more than 500 hours on any one matter in any year, whereas virtually all the male associates in the department worked on major matters for which they logged at least 600 hours per year. Ms. Ezold complained about the quality of her assignments and the limited number of partners she was assigned to work with. The Litigation Department Chairman acknowledged the inferiority of Ms. Ezold's work opportunities and promised to correct them.

During the last two years of her employment at Wolf, Block, Ms. Ezold's work at the Firm included supervising junior associates in their preparation of briefs and pleadings. In 1988 the Chairman of the Litigation Department, Mr. Davis, gave Ms. Ezold an outstanding review for her work on a complex matter. At trial on the liability portion of this case, Mr. Davis stated that when he evaluated Ms. Ezold he believed it had been established that she had excellent skills in various areas of litigation, including case management, wit-

ness preparation, dealing with opponents, professionalism, maturity, aggressiveness and a whole series of other traits he considered to be extremely useful to the Department. Mr. Davis' evaluation of Ms. Ezold is consistent with virtually all of the evaluations of Ms. Ezold by partners with whom she worked. Those partners who evaluated Ms. Ezold neutrally or critically cited the lack of complexity in her assignments or their lack of sufficient contact with her necessary to make a meaningful evaluation.

In October of 1988 Ms. Ezold was informed that she would not be recommended for partnership because too many partners did not believe she had sufficient analytical ability to handle complex legal issues. The test that the Firm applied to the plaintiff for purposes of determining whether to recommend her for partnership was that she must demonstrate the analytical ability to handle the most complex litigation. This standard was stricter than that applied to male associates who were candidates for partnership along with Ms. Ezold. Many of the male associates who were admitted as partners effective February 1, 1989, had received numerous evaluations severely critical of their work.

In November of 1988, the Chairman of the Firm's Executive Committee, Mr. Kopp, confirmed to Ms. Ezold that she would not be recommended for admittance to the partnership. Mr. Kopp offered Ms. Ezold partnership in the Firm's Domestic Relations Department if she would remain an associate for one more year. After trial in this matter, I determined that the Firm had considered Ms. Ezold's gender in its 1988 decision not to promote her to partner in violation of Title VII of the Civil Rights Act of 1964.

## DISCUSSION OF AVAILABLE RELIEF

I. *Remedial Authority of the Federal Courts under Title VII*

The remedial scope of Title VII, as first enunciated in section 706(g) of the Civil Rights Act of 1964, is broad:

> If the court finds that the respondent has intentionally engaged in ... an unlawful employment practice ... the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without backpay ... or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e–5(g) (1988).

This language may be read as a mandate for the exercise of broad discretion in crafting effective remedies for employment discrimination. The broad remedial power of the courts under Title VII to remedy unlawful employment discrimination was embellished by the legislative history to the 1972 amendments to the Civil Rights Acts in which Congress revised section 706(g):

> The provisions of this subsection are intended to give the courts wide discretion exercising their equitable powers to fashion the most complete relief possible.... [T]he scope of relief ... is intended to make the victims of unlawful discrimination whole ... so far as possible, [to return them] to a position where they would have been were it not for the unlawful discrimination.

118 CONG.REC. 7168 (1972).

The Supreme Court has interpreted this statutory language to mean that "federal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible the victims of ... [employment discrimination]." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976) (footnote omitted). That the courts were given broad equitable powers by Congress confirms the purpose of Title VII to make whole victims of discrimination in the workplace. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 420–21, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280 (1975). Such a statutory purpose will only be accomplished if the remedial structure of Title VII is flexible, thus enabling the courts "to put a victim of discrimination in the position that she or he would have been in

but for the unlawful discrimination." *Hopkins v. Price Waterhouse*, 920 F.2d 967, 976 (D.C.Cir.1990).

The flexible "make whole" approach to Title VII remedies authorized by Congress does not absolve a district court of the responsibility to measure possible remedies alongside the purposes of Title VII carefully. Broad equitable discretion must be complemented with "the principled application of standards consistent with those purposes ..." *Albemarle Paper*, 422 U.S. at 417, 95 S.Ct. at 2371. In determining what standards of application would be consistent with Title VII, it is noteworthy that one of the specific congressional concerns motivating the 1972 amendments to Title VII was "the need to tear down discriminatory barriers in the top echelons of the job market that continued to prevent women and minorities from 'ascend[ing] the higher rungs in professional life.' " *Hopkins*, 920 F.2d at 977.

The language of section 706(g) specifically provides for backpay as an appropriate Title VII remedy. As an incentive for employers to eliminate discriminatory practices, back pay has a direct connection with Title VII's primary objective of achieving "equality of employment opportunities and [removing] barriers that have operated in the past...." *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Reinstatement, or alternatively front pay, may also be appropriate Title VII remedies for returning a victim of discrimination to the position he or she would have occupied absent the discrimination. Several circuits have approved front pay as a means of making plaintiffs whole for losses caused by discrimination. *See Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir.1982), *citing United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 932 (10th Cir.1979).[1] The ordering of reinstatement in the form of admission to a partnership is also within a district court's remedial authority under Title

VII. *See Hopkins*, 920 F.2d at 979, *citing Hishon v. King & Spaulding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Such equitable relief is consistent with the general goal of making the remedy "equal to the injury." *Albemarle Paper*, 422 U.S. at 418, 95 S.Ct. at 2372.

Additionally, the Supreme Court has instructed that a complete remedy "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper*, 422 U.S. at 421, 95 S.Ct. at 2373. This instruction is particularly significant here since Wolf, Block now asserts that this court's finding of no constructive discharge operates to limit the scope of remedies available to Ms. Ezold, a standard which, if applied by this court, could deny her a complete remedy.

## II. Constructive Discharge as a Limit to Title VII Relief

■ Had Wolf, Block recommended Ms. Ezold for admittance to the Firm in the fall of 1988, her status as a partner would have been effective February 1, 1989 in accordance with Firm policy. Ms. Ezold remained employed as an associate at the Firm until her resignation June 7, 1989. Wolf, Block contends that the only remedy available to Ms. Ezold is back pay covering the four-month period between the date her unlawfully denied partnership would have become effective and the date of her resignation. As a basis for that argument Wolf, Block asserts that the circuit courts have been nearly unanimous in their application of the constructive discharge rule, whereby victorious Title VII plaintiffs who have left their employment with the defendant but who were not constructively discharged by the defendant are only entitled to a remedy covering the period during which the discrimination occurred up to the date of res-

---

1. *See also James v. Stockham Valves & Fitting Co.*, 559 F.2d 310, 358 (5th Cir.1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); *Equal Employment Opportunity Comm'n v. Enterprise Association Steamfitters,* *Local 638,* 542 F.2d 579 (2d Cir.1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977); *Patterson v. American Tobacco Co.,* 535 F.2d 257, 269 (4th Cir.), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976).

ignation. In response, the plaintiff asserts that other circuits have properly declined to apply the constructive discharge rule as harshly, deeming it to be relevant only to the question of mitigation.

The Third Circuit has held that a constructive discharge occurs when an employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would would resign." *Goss v. Exxon Office Systems Company,* 747 F.2d 885 (1984). As the Third Circuit has yet to address the issue of how constructive discharge doctrine affects the scope of Title VII relief however, the rationales behind the application or non-application of the constructive discharge rule by the Circuits should be examined in light of the facts of this case. Analysis of the cases discussing this issue reveals that the rigid application of the constructive discharge rule to the plaintiff here would defeat the goals and purposes underlying Title VII.

Several circuits have applied the general rule that employees are entitled to awards such as back pay past the date of resignation and reinstatement only if they were actually or constructively discharged from their employment.[2] The rationale behind application of the rule has most often been that "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships," a rationale first stated by the Fifth Circuit in *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61 (1980). The Ninth Circuit expanded on that principle in *Thorne v. City of El Segundo,* 802 F.2d 1131 (1986), emphasizing that an employee "should not quit at the first sign of institutional discrimination." *Id.* at 1134. The *Thorne* court also

stated that restricting backpay awards "encourages the employee to work with supervisors within the existing job setting and employment relationship in an effort to overcome resistance within that workplace and to eradicate the discrimination." *Id.*[3]

A simpler rationale behind the constructive discharge rule was enunciated in *Derr v. Gulf Oil Corp.,* 796 F.2d 340 (10th Cir. 1986). At trial the district court determined that though no constructive discharge took place, an employee had acted reasonably in quitting her job after being denied a promotion, and that therefore back pay would not be limited to the date of resignation. The Tenth Circuit overruled and applied the constructive discharge rule to limit back pay, stating that it was inconsistent for the trial court to have found that the employee acted reasonably in quitting where no constructive discharge had occurred. *Id.* at 343.

The Third Circuit has not taken a position on the issue of constructive discharge as a strict limit on Title VII relief, stating only that "[c]lassifying a termination as a constructive discharge rather than a voluntary quit has significant ramifications with respect to the scope of relief." *Goss,* 747 F.2d 885 (1984). Goss, a married woman, was a successful sales representative who became a victim of gender discrimination at the hands of her employer after she admitted to her supervisor that she intended to have both a family as well as a career. After repeated verbal abuse and intimidation questioning her ability to handle the dual responsibilities of a career and motherhood, Goss resigned her employment. The Third Circuit affirmed the district court's finding that a constructive discharge had occurred, holding that no specific intent on the part of the employer to bring about a discharge is required. Thus

2. *Jurgens v. Equal Employment Opportunity Commission,* 903 F.2d 386 (5th Cir.1990); *Morrison v. Genuine Parts Co.,* 828 F.2d 708, n. 1 (11th Cir.1987); *Maney v. Brinkley Municipal Waterworks and Sewer Department,* 802 F.2d 1073 (8th Cir.1986); *Derr v. Gulf Oil Corporation,* 796 F.2d 340 (10th Cir.1986); *Satterwhite v. Smith,* 744 F.2d 1380 (9th Cir.1984); *Clark v. Marsh,* 665 F.2d 1168 (D.C.Cir.1981).

3. The Ninth Circuit did not adopt the constructive discharge rule in *Thorne,* refusing to apply it to a Police Department employee who resigned from her clerk-typist position after the Department discriminatorily refused to hire her as a police officer. The court only recognized the "valid policy reason for limiting backpay awards in promotion cases." *Thorne,* 802 F.2d at 1134.

Goss was entitled to a remedy not only for the pre-discharge gender discrimination, but also for the wrongful termination of her employment. *Goss*, 747 F.2d at 889.

Where a plaintiff resigns after having been discriminatorily denied the one significant promotion available within the arena of his or her employment however, a more appropriate standard for determining the entitlement to relief past the date of resignation is one of reasonableness. In denial of promotion settings, the application of the constructive discharge rule is almost illogical because the employer is acting discriminatorily with the effect of keeping the plaintiff *in* his or her current position. Over and above the humiliation inflicted upon plaintiffs like Goss, a plaintiff who is discriminatorily denied a significant promotion, such as partnership in a professional firm, is burdened by the knowledge that she has been denied the job title and compensation commensurate with the success she has achieved in the performance of her work over the course of several years; were it not for her gender she would have been promoted to the significantly superior employment position she deserves.

Strict application of the constructive discharge rule in denial of promotion cases would mean that no matter how severe an employer's discrimination is with respect to the denial of a promotion, an employee would be forced to remain in the inferior employment position so long as the employer does not permit the working conditions of the inferior employment position to become intolerable. If the employee instead resigns the inferior position, her entitlement to a remedy for the discriminatory denial of the superior position would cease at the date of resignation. Such a rule flouts the Supreme Court's instruction that a complete Title VII remedy "should only be denied for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for the injuries suffered through past discrimination." *Albemarle Paper*, 422 U.S. at 421, 95 S.Ct. at 2373.

Following *Goss*, the Third Circuit indicated in *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69 (1986), that the equitable back pay remedy should not be denied when a plaintiff acts reasonably under the circumstances. In *Waddell*, an employee had delayed in pursuing his religious discrimination charge, leaving it dormant at the Equal Employment Opportunity Commission for some four-and-one-half years while he continued his employment with the defendant, Small Tube. The district court found that in light of the equitable nature of the backpay remedy, it would have been unjust for Small Tube to bear the financial responsibility for the delay period. The Third Circuit remanded the case to the district court for purposes of determining whether the employee's conduct had been excusable or not, instructing that "[t]he statutory purposes articulated in *Albemarle* would patently be frustrated by a reduction of backpay when the plaintiff's delay was not found to be unreasonable." *Waddell*, 799 F.2d at 79.

This district has recognized that the efficacy of Title VII would be similarly diminished were its remedies to be reduced to merely back pay up to the date of resignation whenever no constructive discharge is found in denial of promotion cases. In *Helbling v. Unclaimed Salvage and Freight Co., Inc.*, 489 F.Supp. 956 (E.D.Pa. 1980), a female employee was denied promotion to store manager and resigned her employment. Finding that she had been discriminatorily denied the promotion on the basis of her gender, the court rejected any notion that her back pay award should terminate on the date of her resignation. Referring to her reasons for leaving—disagreement with the male employee promoted instead—the court held that "[t]he back pay award, therefore, must be based on the period running from the date she should have been promoted to manager to the date the store closed—the period it can be assumed she would have held the job to which she was entitled." *Id.* at 963.

Other courts have similarly found the rigid application of the constructive discharge rule to be inconsistent with Title VII's remedial objectives. The Fourth Cir-

cuit, in *Wells v. North Carolina Board of Alcoholic Control*, 714 F.2d 340 (1983), held that back pay would appropriately extend to the date of judgment where the defendant employer's discriminatory denial of promotion was causally related to the plaintiff's resignation of employment. The court limited the constructive discharge issue to bear only on the issue of mitigation, i.e. the amount of the damages award.

In *Wells* the aggravation of the plaintiff's back injury occurred after his employer discriminatorily denied him a promotion which would have enabled him to avoid heavy lifting. Thus the plaintiff's subsequent resignation was said to have been causally related to the discriminatory denial of promotion. Wolf, Block attempts to distinguish *Wells* on the basis that the relationship between the employer's discriminatory action and the employee's resignation in *Wells* was much more direct than it is here. However the Fourth Circuit's treatment in *Wells* of the constructive discharge issue in the context of a Title VII case is most consistent with the "make whole" purposes of the statute, and is instructive here, where the plaintiff was not simply subjected to a one-time isolated discriminatory decision but instead endured a pattern of discriminatory treatment by Wolf, Block during her entire career at the Firm, culminating with the partnership denial. To require the causal relationship between an employer's illegal conduct and an employee's resignation to meet the standards imposed in constructive discharge cases in order for a Title VII plaintiff to be awarded relief past the date of resignation would severely frustrate those same purposes by "limiting the remedy awarded to a plaintiff

who has succeeded in establishing [a] defendant's unlawful conduct, and 'rewarding' prior illegal conduct by the same defendant." *Richardson v. Restaurant Marketing Associates, Inc.*, 527 F.Supp. 690 (N.D.Cal.1981).[4]

Indeed even those circuits who have applied the constructive discharge rule in such a limiting fashion have not clearly defined the place occupied by the constructive discharge rule in the realm of Title VII. The Fifth Circuit's *Jurgens* opinion appears to express uneasiness with the ramifications of a strict constructive discharge rule limitation on Title VII relief, characterizing the rule as only part of the employee's duty to mitigate.[5] However that characterization of the constructive discharge rule, as merely a standard for reviewing a Title VII plaintiff's mitigative action, infringes somewhat on the Supreme Court's treatment of the mitigation duty in *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231–2, 102 S.Ct. 3057, 3065–6, 73 L.Ed.2d 721 (1982), where the Court stated:

> An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g). This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work ... or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied.

In footnote 4 to its *Jurgens* opinion, the Fifth Circuit interprets that mitigation standard as applicable only to those em-

---

4. In *Richardson*, a restaurant employee who had decided to resign effective two days after she filed an employment discrimination complaint was fired the day she filed it. Upon being found to have engaged in unlawful discrimination, the restaurant argued that backpay should be limited to the two days between the firing and the date of intended resignation. The district court disagreed, reasoning that the restriction of relief past the date of resignation should only occur where an employee leaves her employment for reasons *unrelated* to the discrimination suffered. *See id.* at 696.

5. The Fifth Circuit's opinion in *Jurgens*, 903 F.2d at 389, states:

> We find no inconsistency in determining entitlement to such back pay, in some cases, by whether the employee properly mitigated damages after his retirement or resignation, and in other cases, involving denial of promotion, by whether the employee was constructively discharged. *We simply hold, as we did in* Bourque, *that where an employer discriminatorily denies promotion to an employee, that employee's duty to mitigate damages encompasses remaining on the job.* (emphasis added).

ployees no longer maintaining an employment relationship with the defendant employer. According to the Fifth Circuit then, those employees who are victims of unlawful discrimination but who have not been fired, must remain on the job or else forfeit the right to an award of damages past the date of resignation if no constructive discharge occurs.

In light of above-discussed decisions, and in light of the wide variation among the facts of any given Title VII case, the constructive discharge doctrine should not operate within the context of Title VII as the severe limitation on Title VII relief advocated by Wolf, Block. From the extreme harshness of a discriminatory firing or the denial of a long-awaited career-making promotion, through the demoralizing stagnation of a discriminatory demotion, to the more subtle discrimination contained in subjection to different working conditions, Title VII encompasses a great range of unlawful behavior by employers in their relationships with employees.

"In tailoring a Title VII remedy a court 'has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'" *Ford Motor Co.*, 458 U.S. 219, 233, n. 20, 102 S.Ct. 3057, 3066, n. 20, 73 L.Ed.2d 721 (quoting *Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. at 2372). Wholesale application of the constructive discharge rule prevents fulfillment of that responsibility. The elimination of the availability of relief past the date of a Title VII plaintiff's resignation would conflict with the remedial duty specified above in that the plaintiff could neither be compensated for his or her injury, nor would a defendant be deterred from further discrimination. In addition such a restriction would discourage a plaintiff from mitigating damages by accepting a position at another employer where he or she would be permitted to advance without discrimination.

*Harrison v. Dole*, 643 F.Supp. 794 (D.D.C. 1986).[6]

### III. *Application of the Constructive Discharge Rule to Eliminate Relief Beyond the Date of Ms. Ezold's Resignation*

■ The application of the constructive discharge rule here, where the plaintiff was discriminatorily denied the one significant promotion available to an attorney practicing in a private firm setting, would be contrary to the most basic principles of equity underlying Title VII. Not only would a complete remedy be withheld from the plaintiff, but she would also be robbed of the freedom, once her promotion was denied, to seek out, both as a mitigative measure as well as for personal/professional advancement, employment opportunities that approach the position which the plaintiff was discriminatorily denied and that are superior to the position in which the employer discriminatorily forced the plaintiff to remain.

Having practiced law for approximately eight years, the plaintiff had completed her fifth year as a litigation associate at the defendant Firm when she became eligible for partnership consideration in the fall of 1988. For an attorney practicing in a private firm, "coming up for partner" is what an associate strives for in the years preceding. Unlike the structure in many businesses, corporations, and government organizations, where often there exist many step-by-step, small scale promotions, the partnership decision is often a make-or-break event for an associate who has persevered long enough to be considered for admittance to the partnership. In denying Ms. Ezold that partnership, Wolf, Block was not withholding an incremental benefit from the plaintiff. Instead the defendant Firm had denied Ms. Ezold what is by far the single most significant promotion achievable in the arena of private law

---

**6.** In *Harrison*, several black women employees of the United States Maritime Administration resigned after being denied promotions on the basis of their race. The district court permitted back pay past the date of resignation as well as reinstatement, stating that the restriction of Title VII relief past the date of resignation is "supported neither by the cases cited in [the defendant's] brief, nor by reason." *Id.* at 796.

firms, and it had done so, at least in part, on the basis of her gender.

Wolf, Block asserts that the constructive discharge rule should limit Ms. Ezold's relief to back pay covering the period between the date her partnership would have become effective (February 1, 1989) and the date she resigned (June 7, 1989), a period of just over four months. The cases cited by Wolf, Block for that argument[7] premise the rule's application upon the desire to encourage employees to stay at the place of employment in order to give the employer a chance to remedy the discrimination; an employee should not quit at the first sign of discrimination. In *Thorne, supra,* the Ninth Circuit supplied an important qualification to that policy however:

> "Where, as here, an employee has no such opportunity [to overcome resistance in that workplace and to eradicate discrimination there], then these incentives have no relevance and back pay restrictions are inapplicable."

802 F.2d at 1134. Indeed, "the policy of encouraging solutions within the context of the working relationship makes sense only when a possible solution exists." *Nobler v. Beth Israel Medical Center,* 715 F.Supp. 570, 572 (S.D.N.Y.1989). Where such a possibility can no longer be said to exist, back pay should not be restricted where the motivation for resignation is the very discrimination suffered and not some unrelated reason, even where no constructive discharge took place. *Id.* at 572–3. Wolf, Block attempts to distinguish *Nobler* on the grounds that in *Nobler* there was no opportunity for the plaintiff to solve the problem of discrimination from within because the plaintiff was denied a position for which only one space existed, whereas space in the Firm's Partnership is not so limited. This stance conflicts with evidence presented at trial that in the eyes of Wolf, Block, it was unlikely that Ms. Ezold would ever become a partner.

More than many employees would, Ms. Ezold can be said to have followed the directions of those circuits who would instruct her to battle the discrimination from within. She can hardly be accused of quitting at the first sign of discrimination. Having been told at the start that as a female it would be more difficult for her at Wolf, Block, Ms. Ezold nonetheless embarked on a career at Wolf, Block as a litigation associate. In spite of receiving admittedly inferior work assignments and a less than normal exposure to Wolf, Block's partners, she proceeded to build a reputation as a dependable, talented lawyer, resourceful in the courtroom and popular with the clients on whose matters she worked. But whereas those previous signs of discrimination had been theretofore surmountable in that they did not prevent her from achieving the successes that merited admittance to the Partnership, Wolf, Block's denial of partnership to Ms. Ezold in the fall of 1988 was a blow she could not sit back and endure with the same willingness to return to the grindstone as she had for the previous five years. Eight months after being informed of the partnership denial, Ms. Ezold resigned in order to accept a position as president of one of Wolf, Block's clients.

Wolf, Block has maintained that it wanted Ms. Ezold to stay with the Firm. One partner, a member of the Firm's Executive Committee (which is responsible for making the final partnership recommendation to the entire Partnership for vote) indicated to Ms. Ezold that she could become a partner in charge of the Domestic Relations Department if she would remain another year as an associate, yet refused to grant her an annual salary increase typically granted to associates. It is reasonable to conclude that in light of the evidence presented, the opportunity for Ms. Ezold to overcome and eradicate the discrimination she had suffered by remaining at the Firm had finally been foreclosed.

That Ms. Ezold chose to leave Wolf, Block in an attempt to replenish and continue her career was not a knee-jerk reaction to a one-time discriminatory act by Wolf, Block. As it is for any senior associate in large law firm, the partnership decision regarding Ms. Ezold was a culmination of

---

7. *See* note 2, *supra.*

her entire career theretofore at the firm, most likely encompassing 10,000 or more hours billed on Wolf, Block client matters. In Ms. Ezold's case however, the adverse partnership decision also represented a culmination of the numerous elements of discriminatory treatment she had received throughout her years at the Firm. When Wolf, Block unlawfully permitted gender to enter into its consideration of Ms. Ezold for partner, she understandably came to the conclusion that her career at the Firm would be limited to a much greater extent than she could reasonably accept.

The statutory purposes of Title VII enunciated in *Albemarle Paper*, 422 U.S. at 421, 95 S.Ct. at 2373, would be severely frustrated were Ms. Ezold's back pay to be limited strictly to the four-month period between the date on which the adverse partnership decision took effect and the date of her resignation, when her conduct in leaving the firm was not unreasonable. Application of the constructive discharge rule here would give employers a free hand to engage in a careful campaign of subtle discrimination against an employee—such as inferior work assignments, etc.—which so long as it does not rise to the level of making working conditions intolerable, would not make the employer responsible for its unlawful actions past the date at which the victimized employee surrenders by resigning.

Although Wolf, Block argues that to refrain from applying the constructive discharge rule here would render that doctrine meaningless, to apply it rotely to the plaintiff, an attorney who was subjected to a pattern of discriminatory treatment by her employer over a five-year period, punctuated by a denial of partnership, would be inconsistent with even the plainest view of the purposes of Title VII. Title VII is no less empowered to eradicate those discriminatory acts which are subtly disguised and carefully implemented as it is with respect to those acts of blatant discrimination which make working conditions intolerable; it was enacted to eradicate any unlawful discrimination and to make employees whole for the injuries they have suffered as a result of their employers' considera-

tion of certain discriminatory elements, such as gender, in the context of the employer-employee relationship.

Constructive discharge doctrine meanwhile, developed under the National Labor Relations Act, has also taken an important place in the context of employer-employee relations, enabling the courts to go beyond the simple query as to whether the employee was "fired" and to scrutinize more equitably an employee's decision to leave his or her employment. The two doctrines—Title VII and constructive discharge—are born of different necessity and each holds a defendant to a different standard for purposes of determining liability. As constructive discharge doctrine addresses only the "tolerability" of the conditions in which an employee must work, be they motivated by lawful or unlawful considerations, Title VII's scrutiny includes the lawfulness of the bases upon which an employer sets those conditions. Such a distinction suggests that constructive discharge doctrine is not a perfect measure of the severity of a Title VII claim for purposes of determining the appropriate scope of relief, just as the application of a different standard of liability for each doctrine suggests that one is not a perfect barometer of the legal merit of the other.

The constructive discharge inquiry as to the tolerability of Ms. Ezold's working conditions at Wolf, Block is not rendered meaningless by an inquiry as to whether her decision to resign was reasonable under the circumstances for purposes of determining the appropriate Title VII relief for the period after her resignation. The constructive discharge inquiry may be informative for purposes of determining whether Ms. Ezold properly mitigated her damages, but it is not appropriately applied as a strict limitation on the scope of Title VII relief available to her here. An appropriate order follows.

## ORDER

AND NOW, this 15th day of March, 1991, in consideration of the memoranda of law submitted by the plaintiff, Nancy

O'Mara Ezold, and the defendant, Wolf, Block, Schorr and Solis–Cohen, as well as the replies thereto, on the matter of the available scope of relief under Title VII in light of this court's prior finding upon trial that the defendant had violated Title VII by considering the plaintiff's gender in its decision to deny her partnership, it is ORDERED that trial upon the matter of damages should proceed with respect to the following issues:

(1) back pay;

(2) the instatement of the plaintiff, Nancy O'Mara Ezold as a Partner within the defendant Firm, Wolf, Block, Schorr and Solis–Cohen, or in the alternative, front pay;

and (3) proper mitigation of damages by the plaintiff.