Nancy O'Mara EZOLD

v.

**WOLF, BLOCK, SCHORR AND SOLIS–COHEN.**

Civ. A. No. 90–0002.

United States District Court, E.D. Pennsylvania.

Nov. 29, 1990.

Judith P. Vladeck, New York City, for plaintiff.

Mark S. Dichter, Philadelphia, Pa., for defendant.

### AMENDED MEMORANDUM

JAMES McGIRR KELLY, District Judge.

The court has now considered the testimony that has been presented in this case and is prepared to make its Findings of Fact and Conclusions of Law and decision.

### FINDINGS OF FACT

1. Plaintiff Nancy Ezold has alleged that Wolf, Block, Schorr and Solis–Cohen ("Wolf, Block" or "the Firm") discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, when it decided not to admit her to the partnership. Ms. Ezold also alleged that she was constructively discharged by Wolf, Block on account of her sex by reason of the adverse partnership decision. In addition, Ms. Ezold alleged a claim under the Equal Pay Act, 29 U.S.C. § 206(d), of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* The Court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e–5(f)(3).

2. Prior to trial, with the agreement of the parties, the Court bifurcated the issues of liability and damages.

3. In addition, the Court severed Ms. Ezold's claim under the Equal Pay Act pursuant to Fed.R.Civ.P. 42(b).

4. Ms. Ezold graduated from Villanova Law School in 1980. She graduated 61st out of a class of 194, and was not a member of the Villanova Law Review.

5. Subsequent to her graduation from law school, Ms. Ezold worked at the Law Firm of Kirschner, Walters & Willig from 1980 to 1981. She was involved primarily in the representation of union members through their union legal services plan in personal matters such as workers' compensation, domestic relations and real estate settlements.

6. From 1981 to July, 1983, Ms. Ezold worked at the law firm of Phillips and Phelan. This firm had two attorneys besides the plaintiff.

7. The defendant Firm hires associates on one of two categories—partnership track and non-partnership track. The plaintiff was hired by the defendant as an associate on a partnership track basis in 1983.

8. The defendant Firm was fully aware of the plaintiff's background when it hired her. There were no objections by anyone on the defendant Firm's hiring committee to the plaintiff's hiring or placing her on a partnership track.

9. Wolf, Block is a law firm based in Philadelphia which, as of 1989, was comprised of 249 attorneys, approximately one-half of whom were partners. Wolf, Block has a number of departments, including real estate, corporate, litigation, taxation, estates and labor. During the time Ms. Ezold worked at Wolf, Block, the Litigation Department grew from 36 to 55 attorneys.

10. Wolf, Block is governed by a 5–member Executive Committee which is responsible for establishing policy for the Firm and for operating the Firm on a day-to-day basis. The Executive Committee's members are elected by the Firm's voting partners.

11. Wolf, Block has a 10–member Associates Committee which includes partners from each of the Firm's departments. The members of the Associates Committee are appointed by the Executive Committee.

12. The Associates Committee is responsible for, *inter alia,* reviewing the performance and evaluations of all of the Firm's associates and making recommendations to the Firm's Executive Committee as to salary and as to which associates should be admitted to the partnership.

13. The Executive Committee reviews the partnership recommendations of the Associates Committee and, in turn, exercises its own discretion in making partnership recommendations to the entire partnership. Only those persons who have been recommended for partnership by the Executive Committee are considered for admission to the partnership by the Firm's voting partners, upon whom rests the sole and ultimate responsibility for determining who is elected to the partnership.

14. The defendant Firm hires many associates immediately after their graduation from law school or completion of a judicial clerkship (referred to as "non-laterals"). Non-laterals are considered for partnership approximately 7½ years after their graduation from law school. Other associates, referred to as "laterals," are hired after they have had experience working at other law firms or in other post-law school employment, and are generally subject to a five-year rule for partnership consideration.

15. Until 1989, certain associates of an experience level to be admitted to a partnership were accorded "special partner" status. Such individuals, in contrast to other partners (referred to as "regular" partners), do not have the right to vote or to receive any equity share in the partnership, are subject to removal by the Executive Committee, and have benefits which are inferior to those provided to regular partners.

16. In the Spring of 1983, Ms. Ezold applied for employment at Wolf, Block. She met initially with Seymour Kurland, who was then the Chairman of the Litigation Department.

17. From 1983 until 1987, Mr. Kurland was the chair of the Litigation Department. Thereafter Alan Davis served as chair of the Litigation Department.

18. In 1983, Ms. Ezold was offered a position as an associate in Wolf, Block's Litigation Department. During the selection process, she had meetings and telephone conversations with Mr. Kurland, who said that her prior work experience helped make her an attractive candidate to do litigation for Wolf, Block. Mr. Kurland told Ms. Ezold that it would not be easy for her at Wolf, Block because she did not fit the Wolf, Block mold since she was a woman, had not attended an Ivy League law school, and had not been on law review. Mr. Kurland and Ms. Ezold stated that at one of the meetings with Ms. Ezold, only Ms. Ezold and he were present.

19. Subsequent to the aforementioned meeting, but before accepting Wolf, Block's offer of employment, Ms. Ezold had lunch with Roberta Liebenberg and Barry Schwartz, who were both members of the Litigation Department. Ms. Ezold admitted she did not mention to them the statement by Mr. Kurland that she would have a difficult time at Wolf, Block because she is a woman, did not ask them any questions about the treatment of women at Wolf, Block, and did not express to them any concern over the Firm's treatment of women.

20. Ms. Ezold began working at Wolf, Block in July, 1983 and was assigned to the Firm's Litigation Department.

21. From 1983 until 1987 Mr. Kurland was responsible for assignment of work to associates in the Litigation Department, a duty he delegated in part to partner Steven Arbittier. Thereafter Mr. Davis assumed

primary responsibility for distribution of work to associates in the Department.

22. Ms. Ezold handled various matters for the defendant during her tenure at Wolf, Block. She worked for partners in the Litigation Department on criminal matters, insurance cases, general commercial litigation and other areas, and also did work for some partners in other departments. She handled matters at all stages of litigation, and was called upon by partners to go to court on an emergency basis.

23. Ms. Ezold routinely researched and drafted briefs and pleadings on the matters on which she worked, and during the last two years of her employment at Wolf, Block, supervised junior associates in their preparation of briefs and pleadings.

24. Mr. Arbittier primarily assigned the plaintiff to civil actions that were small cases by Wolf, Block standards, and a variety of criminal matters.

25. For example, in 1983, Mr. Arbittier assigned the plaintiff, together with an associate, Mr. McCullough, responsibility for a large group of minor cases previously handled by Steve Levin, an associate who had worked on such matters and had left the Firm.

26. Thereafter, the plaintiff was given responsibility for ten to fifteen bankruptcy matters involving collections of $400 or less.

27. Ms. Ezold did not work for more than 500 hours on any one matter in any year according to the defendant's computer-maintained time records. In contrast, virtually all the male associates in the department worked on major matters for which they logged at least 600 hours per year.

28. The plaintiff attended regular assignment meetings in the Litigation Department where she had the opportunity to observe the assignments being given to male associates. She learned at such meetings of the informal procedure by which partners spoke directly to certain associates to assign them responsibilities bypassing the formal assignment procedure.

29. During one such meeting, Mr. Arbittier asked for a volunteer to work on a preliminary injunction. Although Ms. Ezold was the only associate to volunteer, and was initially assigned the case, within an hour Mr. Arbittier, without explanation, had reassigned it to a male associate.

30. The plaintiff complained about the quality of her assignments in civil matters to the Litigation Department partners who assigned cases to associates. The plaintiff also objected to being assigned to work with only a very limited number of partners. Mr. Kurland acknowledged that most of the work opportunities given to the plaintiff were inferior and promised that the problem would be corrected.

31. Part of the negative impression concerning the plaintiff's performance was an impression that she was "not a team player," "institutionally disloyal," and that she "bad mouthed" the Firm to young associates. The only basis of this criticism advanced by the defendant Firm was the plaintiff's perceived concern about women's issues, such as the Firm's treatment of paralegals, who were virtually all female and the Firm's treatment of part-time attorneys who were all female.

32. The defendant claimed that the plaintiff lacked the intellectual capacity required for partnership at the Firm. In a memorandum regarding the plaintiff dated June 19, 1984, Robert Boote, a Litigation Department partner, wrote on behalf of the Associates Committee:

> The doubts about whether someone has a depth of intellectual ability [are] a classic concern here, which sometimes turns out to be self-perpetuating and fulfilling. Nancy is a confident lawyer who is doing well at her level. She should be given every opportunity to display her intellectual ability.

33. In a 1988 memorandum to the Executive Committee urging Ms. Ezold's admission to partnership, Greg Magarity, a Litigation Department partner who had worked extensively with her, described the "Catch 22" of the perception that Ms. Ezold could not handle complex cases. He wrote:

[T]he perception that she is not able to grasp complex issues or handle complex cases ... appears to be a product of how Sy Kurland viewed Nancy's role when she was initially hired. For the first few years Sy would only assign Nancy to non-complex matters, yet, at evaluation time, Sy, and some other partners would qualify their evaluations by saying that Nancy does not work on complex matters. Nancy was literally trapped in a Catch 22. The Chairman of the Litigation Department would not assign her to complex cases, yet she received negative evaluations for not working on complex cases.

34. In a memorandum after his meeting on behalf of the Associates Committee with the plaintiff concerning her evaluation, Mr. Boote wrote in March 1985:

[Kurland] told her that he was going to see to it that the nature of her assignments was changed so that she would have the opportunity to work with various partners in the Department and so that they would have the opportunity to evaluate her.

\*    \*    \*    \*    \*    \*

We told her that we did not view it as her fault that she hadn't had the opportunity to demonstrate these [technical] abilities yet, since her work was in large measure a product of the assignments she got.

35. During that meeting, Mr. Boote and Mr. Kurland made a commitment to the plaintiff that she would be assigned an appropriate mix of cases, reporting to a wider group of partners. Ms. Ezold was told that she could not be properly evaluated because she had not had the opportunity to show her skills.

36. Mr. Kurland told Ms. Ezold to let him know if partners tried to assign smaller matters to her directly. Nevertheless, although he was head of the department, Mr. Kurland never assigned her to work on a matter for which he was responsible, except for one case in which Wolf, Block's participation as one of five firms representing plaintiffs was minimal, and on even that case she had virtually no contact with Mr. Kurland.

37. In a February 1986 memorandum, Mr. Boote noted that Ms. Ezold was handling a number of small matters for Mitchell Panzer. Mr. Boote and Mr. Kurland wanted to reassign these matters "both to free Nancy up a little and to give some demonstration that we are making an effort to change the nature of her assignments." Mr. Boote and Mr. Kurland also told Ms. Ezold that "we would make the effort to try to give her the assignments that will enable her to attempt to build a place for herself."

38. Many partners bypassed both Mr. Kurland and Mr. Arbittier in selecting associates to work on their cases. Mr. Kurland, in permitting this activity to happen, prevented the plaintiff from securing improved assignments.

39. The plaintiff worked with a limited number of partners in and out of the Litigation Department.

40. The plaintiff's lack of opportunity to work with a significant number of partners seriously impaired her opportunity to be fairly evaluated for partnership. As Charles Kopp wrote in late 1985 to Ian Strogatz:

I have filled out the [evaluation] forms as requested. I have had virtually no contact with any of the senior associates listed. Accordingly, it is difficult to give an opinion as to whether I would feel comfortable in turning over a significant matter for one of my clients or whether I would be in favor of admitting the associate to the firm. When faced with no information, I must answer 'No' to questions like admission to partnership.

41. In Ms. Ezold's 1986 evaluation meeting, Mr. Kurland and Mr. Boote suggested that working in a specialty area would enhance her possibilities for partnership. The partners described continuing and developing her work in white collar crime as a good niche, but one that should not preclude her from taking on general civil work.

42. In his April 1986 evaluation of Ms. Ezold, Mr. Boote wrote: "Nancy is good. Very good. Doing certain kinds of work.

Let's try to let her make a place for herself."

43. Mr. Kurland also stated that he felt that Ms. Ezold could specialize in "trial work" and be valuable to the Firm. If Ms. Ezold specialized in "trial work" and if she became "very valuable to the firm, because it was an area where we really needed somebody and she excelled at that, then that would be a way that she could still perhaps be a partner in the trial department."

44. The plaintiff handled many white collar criminal matters under the supervision of Mr. Magarity, who headed the Firm's white collar crime group.

45. In March 1987, Mr. Magarity wrote a memorandum thanking Mr. Kurland and Mr. Arbittier for permitting Ms. Ezold to work on his matters. In a 1988 memorandum to the Executive Committee in which he urged Ms. Ezold's admission to partnership, Mr. Magarity wrote:

Virtually every other criminal defendant these days is a corporation. Nancy has shown considerable ability to handle these type[s] of important complex cases. The demand for capable litigators with Nancy's skills in this area is abundant but the supply is sparse. *I would be more than willing to have Nancy, as a partner, work full-time in this expanding and lucrative area.*

(emphasis added).

46. Each year at Wolf, Block all partners submit written evaluations of all associates. The evaluations are to be completed regardless of the extent of the partner's familiarity with the associate's work.

47. The evaluation forms are explicit in describing information which is sought about the associate. Ten characteristics of legal performance are listed: legal analysis, legal writing and drafting, research skills, formal speech, informal speech, judgment, creativity, negotiating and advocacy, promptness, and efficiency. Ten personal characteristics are also listed: reliability, taking and managing responsibility, flexibility, growth potential, attitude, client relationship, client servicing and develop-

ment, ability under pressure, ability to work independently, and dedication.

48. The evaluation forms in use for the years 1987 and 1988 describe for the evaluator what each grade means. The grades are described as follows:

Distinguished—Outstanding, exceptional; consistently demonstrates extraordinary adeptness and quality; star.

Good—Displays particular merit on a consistent basis; effective work product and performance; able; talented.

Acceptable—Satisfactory; adequate; displays neither particular merit nor any serious defects or omissions; dependable.

Marginal—Inconsistent work product and performance; *sometimes* below the level of what you expect from Associates who are acceptable at this level.

Unacceptable—Fails to meet minimum standard of quality expected by you of an Associate at this level; *frequently* below the level of what you expect.

49. The instructions on the form direct the evaluator to describe the partner's experience with the associate in the evaluation period. The instructions read as follows:

In order to obtain a full evaluation of this Associate, you are urged to observe the following principles: Ratings should be applied on the basis of what *you* expect of an Associate at this Associate's level of experience. Each item should be answered by selecting the appropriate objective answer with some brief comment, or "NO." (Not Observed). "NO." should be reserved only for those cases where not even a slight observation has been made, as there may be small observations by more than one evaluator which will cumulatively indicate a subtle talent, potential or problem that should be brought out to help the Associate in his/her development. **Most valuable to us are your written comments.** *Attach an additional sheet if necessary to express yourself completely.*

(emphasis in original; bold type supplied).

50. Mr. Strogatz described the process by which associates are evaluated for part-

nership. Senior associates are lateral associates who have completed their second or third years of employment, or non-lateral hires who have completed five years of employment. Senior associates are typically reviewed once a year. Generally, non-senior associates are evaluated twice a year, although that varies somewhat from year to year.

51. The evaluations reflect letter or number grades of an associate's performance in the listed legal and personal skills. Partners are also asked to indicate how they would regard the admission of each senior associate to partnership. The five possible answers for that question are: "with enthusiasm," "with favor," "with mixed emotions," "with negative feeling," or "no opinion."

52. The completed evaluation forms are sent to Eileen McMahon, an administrative employee. Ms. McMahon and her staff collect this information and "[compile] it and they summarize it onto standard forms that we use for the [A]ssociate[s] [C]ommittee[']s purposes.... The summarizations are supposed to be verbatim with what the form says...." Once the evaluations are summarized, the summaries are put in books that are sent to members of the Associates Committee so that each person on the committee gets the information that has been collated and summarized.

53. Each member of the Associates Committee is assigned the responsibility of reading the original evaluation forms in addition to the summaries for certain associates. That committee member drafts a memorandum concerning each of those associates assigned to him or her for this purpose. The memorandum is distributed to the other members of the Associates Committee, usually the day before the meeting of the committee. This memorandum is called the "bottom line memo." The bottom line memo:

> ... is intended to be [the Associates Committee member's] own personal view of what he has gleaned from the evaluations submitted at the time by the partners who submitted evaluation forms, *plus anything in addition that [the As-sociates Committee member] has gleaned from any interviews that he has conducted with respect to those evaluations.*

(emphasis added).

54. The bottom line memo becomes part of the package that each Associates Committee member has before him or her at the Associates Committee meeting.

55. In the years 1987, 1988, and 1989, the bottom line memos contained a "grid," reflecting the Associates Committee member's summary of that associate's letter grades in legal and personal skills for the preceding evaluation period.

56. Committee members do not receive the original individual evaluations as part of their packets. Mr. Strogatz explained that those documents would take too much time for the Associates Committee members to review. The members receive the bottom line memo with its grid as a starting point before the Associates Committee meets. They also receive the summary of evaluations compiled by Ms. McMahon, and reflected on standardized forms.

57. Mr. Strogatz testified that the Associates Committee has no formal voting procedures, but that sometimes the members poll themselves. The committee also formulates a performance review that will be given to each associate and the Associates Committee member who is responsible for giving that review is told at the meeting by the committee what the reviewer should say.

58. Since 1987, the judgment of the Associates Committee concerning a senior associate's prospects for partnership has been reflected on a form. The form lists as possible ratings for the associate's promotion to regular partnership as: "More likely than not," "unclear," "less likely than not," or "unlikely." Similar rankings are used for the likelihood of the associate's promotion to special partnership. That form is given to the associate at the oral review by the responsible Associates Committee member. At the oral review, the consensus of the Associates Committee regarding that candidate is communicated

to the candidate by the responsible Associates Committee member.

59. The Chairman of the Associates Committee reports the recommendation of the committee to the Executive Committee, which has the ultimate authority for recommending to the full partnership the election of candidates to partnership. The full partnership does not vote on candidates not recommended.

60. In the period up to and including 1988, Ms. Ezold received strongly positive evaluations from almost all of the partners for whom she had done any substantial work. In 1987 and 1988, the process of evaluating the plaintiff's candidacy for partnership as a senior associate occurred, and written evaluations from all of the firm's partners were solicited.

61. In December 1986, Robert B. Wolf, a senior partner in the Corporate Department, wrote to Mr. Kurland:

Just a note to express my great satisfaction with the manner in which Nancy Ezold has handled a claim against the Union League, which was forwarded to me by a classmate of mine in Boston.

I like everything about the way Nancy has taken hold, including her research, her meeting with all opposing counsel and her handling of her clients.

Nancy really is top notch.

62. Prior to his leaving Wolf, Block in 1987, Mr. Kurland believed that Ms. Ezold should be admitted to partnership. He wrote in his 1987 evaluation:

Nancy is an exceptionally good courtroom lawyer, instills confidence in clients, gets things done, is unafraid and has all the qualifications for partnership.... What I envisioned about her when I hired her was a 'good, stand-up, effective courtroom lawyer' remains to be true and I think she has proven her case....

63. In his 1987 evaluation of Ms. Ezold, Mr. Boote write that Ms. Ezold "is a valuable asset to the firm." He also wrote:

[C]riminal, negligence, commercial contract cases are all well within her ability. Moreover, in these areas she presents

herself to the court and clients as an effective representative of the firm. I would trust her to handle many significant [matters] on her own.

Mr. Boote voted with favor for partnership for Ms. Ezold in 1987 and 1988.

64. In 1988, Mr. Boote rated Ms. Ezold's legal analysis as "good." He had rated her as "acceptable" in that category in 1987.

65. In 1987, Steve Goodman, a partner in the Corporate Department and a member of the Executive Committee who had had substantial contact with Ms. Ezold, rated her overall legal skills and her legal analysis and legal writing abilities between "distinguished" and "good." He wrote:

She worked very closely with Greg [Magarity] on an important matter for me and I was very favorably impressed with her work. She also successfully handled *a matter that required much legal analysis* and client hand holding.

\* \* \* \* \* \*

She is one of the first people I call to handle any litigation matter. She has always justified my high confidence in her.... I sense some old *perceptions—* baggage—which should be revisited.

Mr. Goodman suggested that Ms. Ezold needed "Better p.r. [public relations]." (emphasis added).

66. Mr. Goodman wrote in his June 1988 evaluation of Ms. Ezold:

I think she handles herself extremely well in both formal and informal settings.... She craves and reaches out for more responsibility.... Has shown industriousness, dedication, good judgment and client skills in several matters. I get the sense she should have [the] opportunity for greater independent responsibility.

67. In 1987, the last year in which he evaluated Ms. Ezold's legal analysis and writing ability, Mr. Schwartz, a Litigation Department partner, rated her in those areas as "good." He wrote: "Nancy has made tremendous progress over the years. As her confidence has grown from front line experience her abilities have expanded.

She is a top flight associate." He added Ms. Ezold "will make a fine partner." In 1988, he rated Ms. Ezold distinguished in all personal qualities, a grade he also gave to her informal speech skills and negotiating skills.

68. Mr. Davis, the Chairman of the Litigation Department at the time, wrote in his June, 1988 evaluation of Ms. Ezold:

Last year I assigned Nancy to assist me in the Home Unity Securities Litigation and a related SEC investigation. Complex civil litigation was new to her. She had to learn about pretrial orders, class certification, responses on objections to lengthy sets of interrogatories and all of the other sophisticated phases of such litigation. With the help of forms from other cases, she produced first class documents. She also managed two complex document productions, including inspection, developing a privilege list, both stamping and putting out the daily brush fires between counsel. Her ability to become so useful and effective in so short a time was truly amazing. Opponents respect her. The Home Unity officers and Directors are crazy about her, and have said so. Nancy is another one of those people who is here weekends and nights—she has difficult family responsibilities. She never complains about workload and is always available. She is one of two or three people who will march into court and handle a preliminary injunction on an hour's notice. The Home Unity case was the first really fair test for Nancy. I believe that her background relegated her to ... matters (where she got virtually no testing by Wolf, Block standards) and small matters. She is much, much better than that. I could handle any case with Nancy and she will soon be able to handle major cases independently—she can do so now, in my opinion, in consultation with an experienced partner. Moreover, she can try cases because of her guts and maturity. That is not true of all of our litigators.

69. Mr. Davis stated that when he wrote his evaluation of Ms. Ezold in 1988 he believed "that it had been established that Nancy had excellent skills in various areas of litigation, including case management, document management, witness preparation, dealing with opponents, professionalism, maturity, aggressiveness and a whole series of other traits that I considered to be extremely useful to the department." He believed she could make a valuable contribution as a junior partner in the Litigation Department.

70. Raymond Bradley, a senior litigation partner, wrote in his June, 1988 evaluation of Ezold:

Although my contacts with Nancy have not been extensive, I have had the opportunity to review several briefs that she wrote and to discuss with her problems on which she was working. I have been impressed by her ability to grasp issues and to think and write about them creatively. She has a good sense of what can and cannot be accomplished.... I think Nancy is a very hard worker who is enthusiastic about her assignments and committed to the interests of the firm and its clients.... She gets things done. Writes very well. Has a good eye for the practical.

71. Ms. Ezold's overall score in legal skills in the 1988 bottom line memorandum presented to the Associates Committee was a "G" for good. It was noted that "overall" she received that year "stronger grades in intellectual skills than last time."

72. The plaintiff, as an associate, needed supervision and guidance from partners as do most, if not all, associates. The mistakes of the plaintiff were not of a greater magnitude or type than were those of male associates who made partner.

73. The test that was put to the plaintiff by the Associates Committee that she have outstanding academic credentials and that before she could be admitted to the most junior of partnerships, she must demonstrate that she had the analytical ability to handle the most complex litigation was not the test required of male associates.

74. Mr. Davis, Chairman of the Litigation Department of the Firm, testified re-

garding the erosion of the standards of the associate pool at the Firm:

At the time we were required to work three nights a week and, if you were smart, you would work four, and you would work on Saturdays. We were always having lunch together, dinner together. The discussion would always be about the law. We would write briefs. We would spend hours on a sentence. We would turn out product that was worthy of General Motors for Sam's Gas Station, because that's who we represented.

The place was indescribably brilliant. And it just isn't that way today. With all deference to some of my young partners who are sitting out there, and they are very, very good, you can't even imagine the way it was in the 1960s. And as time went by, instead of getting the top offers from law officers of Law Review, we began to get people who didn't make officer at Law Review, and then we started to go off Law Reviews and then started going deeper into classes, and thankfully, because discrimination started to relax and erode, we began competing in the market with everybody else. And as a result, the pool of people we had to choose from was the same pool of people everybody else had to choose from, and there were good people and bad people and mediocre people and medium people.

75. Male associates who received evaluations no better than the plaintiff and sometimes less favorable than the plaintiff were made partners.

(1) Male Associate A

76. Associate A, an associate in the Litigation Department, was recommended by the Associates Committee in 1988. Robert Fiebach, who stated that he had had "substantial contact" with Associate A's work, wrote in his 1986 evaluation of him:

I really don't think [Associate A] should become a partner. In fact, if he is made a partner, I will never again submit an evaluation on any associate. I don't

know how he has lasted this long in the firm.

77. Mr. Fiebach testified that his 1987 evaluation showed that Associate A had made "substantial improvement." In Mr. Fiebach's 1988 evaluation of Associate A, Mr. Fiebach did not mark Associate A as distinguished in any category, but he "found enough skills in the good and acceptable category to be comfortable recommending him for partner." He marked Associate A's legal analysis "acceptable." Thus, according to Mr. Fiebach, Associate A had substantially improved to the level of "acceptable" in legal analysis, a rating lower than the overall rating in that area that Ms. Ezold received on her bottom line memo.

78. Barry Klayman, a partner in the Litigation Department, wrote in his fall 1986 evaluation that he "could not rely on [Associate A] to back [him] up in the office while [Klayman] was in court. [Associate A's] writing is dense and mediocre. He missed target dates for completing projects and then hurriedly slapped together something when I complained."

79. Mr. Davis wrote in his 1985 evaluation of Associate A:

At first glance his work looks adequate, if uninspired. However, if you dig under the surface you find a lack of professionalism, both in terms of legal analysis and research. The case on which I worked most deeply with Associate A was a preliminary injunction action in Federal Court. He alleged jurisdiction under the wrong statute and missed a pertinent Supreme Court case that would have shot out at him from rudimentary shepardizing of cases he did cite. The complaint was drafted with bare bones adequacy and the memorandum was superficial and uninspired. The client did not feel that [Associate A] was terribly interested in his case and mentioned his concerns to me. [Associate A] must be useful in our woefully understaffed department because he will take on matters and does get the paper out. However, his work product *should* be below our mini-

mum standards and I believe his intellectual laziness will some day embarrass us.

80. Mr. Davis wrote in his 1988 evaluation of Associate A:

[Associate A] is strictly average. I think he would fade into the background in a group of adversaries representing multiple interests in a complex matter. He does not have or give the appearance of having a winning attitude. I do not believe he will ever attract significant business. His principal strength seems to be that he has not seriously offended anyone important and is useful as a utility man. In my opinion, we have enough partners like [Associate A].

81. In his 1988 evaluation of Associate A, David Kaufman, a partner in the Estates Department, ranked Associate A's writing skills as "unacceptable." David Glyn, another partner in the Estates Department, rated Associate A's abilities in those areas as "marginal," and concurred in Kaufman's view that Associate A "should receive help with writing skills."

82. In 1988 the year in which he was recommended for partnership, Associate A had legal skills that were characterized by Mr. Arbittier as: "Acceptable—Barely adequate." Mr. Arbittier also described him as "[n]ot real smart."

83. In 1988, Anthony Minisi, a litigation partner, evaluated Associate A as follows: "[Associate A] worked on a major matter for me and was not responsible. He was extremely slow in responding."

84. In 1986, Mr. Strogatz wrote that "the partnership issue for [Associate A] depends upon what our standard is going to be."

85. In 1987, Mr. Strogatz wrote: "[Associate A] is pretty good overall, but not quite good enough." Mr. Strogatz wrote that he was concerned that Associate A "may not be bright enough."

86. Associate A's bottom line grid for 1988 summarized his legal analysis grades as "good" and his writing and research as between "acceptable" and "good." His overall ratings thus were lower than those of Ezold.

(2) Male Associate B

87. The Associates Committee recommended Associate B, a litigation associate, for partner in the fall of 1989.

88. In May 1989, David Simon, a litigation partner who described his experience with Associate B as "extremely extensive," stated in a memorandum to the Associates Committee: "There has been a recurrent problem where he simply disappears without notice, sometimes for a couple of days, and sometimes on extended vacations." Mr. Simon also described Associate B's "lack of judgment in dealing with a major client" that almost resulted in the defendant's losing a million dollars a year in billing.

89. Mr. Arbittier wrote of Associate B in 1989:

He just creates the impression that he is bright, but I really don't know for sure. If others like him, I would be happy to see him admitted. He seems like a nice guy who would favorably impress clients.

The 1989 evaluation form shows that Mr. Arbittier's contact with Associate B in the prior year was "none."

90. In 1988, Mr. Arbittier had described his "impression" of Associate B:

Seems bright, but he is a bit of a con man. Not as smart as he seems or thinks he is. Nevertheless, I think he has potential. More sizzle than steak.

91. Mr. Schwartz wrote of Associate B in 1988, the year before his admission to partnership: "He's just too slick to instill ... that degree of comfort." Norman Goldberger, another litigation partner, wrote:

... I'm beginning to think he doesn't want to work hard or on difficult matters. Maybe he has trouble juggling but I'm beginning to believe he doesn't go the entire mile.

92. In the same year, Ms. Liebenberg wrote:

I think [Associate B] is very lazy and when an assignment or case does not interest him, he only gives the matter

minimal attention. I have been very disappointed in the work he has done for me to date.... The client has been very unhappy with [Associate B's] performance. He was late in completing the assignment and did not follow through with the client's problem.

Ken Warren, a litigation department partner, also wrote of Associate B in 1988:

[He] needs to apply himself diligently to learn more. He does not seem willing to do this .... [He] is too anxious to give his work to others. He needs to take a task from start to finish. He appears to work to avoid responsibility.

93. Associate B became a partner in February 1990.

### (3) Male Associate C

94. Associate C, an associate in the Real Estate Department, was recommended by the Associates Committee in 1987. In the 1987 Associates Committee bottom line memo, he received an overall grade of "G," the same as that which Ms. Ezold had received. The summary of evaluations used by the Associates Committee noted that Henry Miller, a partner in the Real Estate Department, had changed Associate C's legal analysis score to ["acceptable"] and suggested that an "adequate [score] may well be sufficient in his mind for regular partnership."

95. Associate C became a partner in February 1988.

### (4) Male Associate D

96. Associate D, an associate in the corporate department, was recommended for partner by the Associates Committee in 1988. In the 1988 evaluation summary sheet reviewed by the Associates Committee, three partners said that Associate D needed help with his writing skills.

97. In 1987, Mr. Strogatz described Associate D as "not institutionally dedicated." He also said that Associate D was "not particularly able" in "client servicing and development." The prior year Mr. Strogatz had written that Associate D had "not applied himself in such a way as to develop

into a first-rate lawyer ... I am not impressed."

98. In 1988, J. Goldberg, a partner in the Corporate Department, wrote in his evaluation that Associate D "[t]ends to shoot from the hip. Leaves me with a feeling of uncertainty...."

99. At the same time, Joseph Manko, a partner in the environmental law department, wrote that Associate D was "less than 'tactful.'"

100. Associate D became a partner in February 1989.

### (5) Male Associate E

101. Mr. Strogatz stated that Associate E was not a star and that an associate did not need to be a star to be a partner. He also wrote that he thought of Associate E "as a guy just to do work."

102. Associate E, who was in the Estates Department, was made partner in 1987.

### (6) Male Associate F

103. The grid on Associate F's bottom line memo in 1988, the year before his consideration for partnership, reflected a composite grade of "G-" for legal analysis.

104. Associate F had graduated from Villanova Law School and had not been on Law Review.

105. In 1989, the year in which he was recommended for partnership, Associate F was described by Alan Kaplinsky, a partner in the Corporate Department, as having as a weakness: "His outrageous personality. He offended terribly my father-in-law in connection with work which he did for him a year or so ago. My father-in-law changed law firms as a result."

106. John Schapiro, then a partner in the Tax Department wrote of Associate F: "A little superficial and hipshooting."

107. The prior year Donald Joseph, a partner in the Litigation Department, had rated Associate F's legal skills as acceptable, noting "a shoddiness in clear thinking or maybe lack of full experience."

108. At the same time, Michael Temin, a partner in the Corporate Department, recommended that Associate F receive help in his writing and drafting skills.

109. Norman Goldberger in 1987, described inappropriate conduct by Associate F:

[Associate F] was supposed to be handling a matter for Henry Miller's client, Hart. I was asked to step in and help supervise. [Associate F] immediately abandoned ship. He failed to follow up with local counsel, call me, provide me with papers or do anything related to the case. Indeed, when called upon by my secretary to provide information, his response was that the case was my case and not his.

110. In 1986, William Rosoff evaluated Associate F:

[H]e is sometimes too fast or flip or not attentive enough. In one matter, he failed to collect on a letter of credit on the grounds that he supposed Al Braslow would handle that part of the matter, when it was an inappropriate assumption to make especially without talking to Al. In another matter, the time for answering a complaint expired. While he might have thought someone else was seeing to it, he should have double checked.

111. Associate F became a partner in February 1990.

## (7) Male Associate G

112. In the bottom line memorandum on Associate G for 1987, the year before he became partner in the Corporate Department, his grid reflected no composite score higher than "G." In four of the legal skills, including legal research and promptness, Associate G was rated only "acceptable."

113. In his 1987 evaluation Associate G was rated "acceptable" in legal analysis by Alan Molod, a partner in the Corporate Department. Mr. Molod added that Associate G was "Not a Star" and was "Sloppy at times and [showed] occasional lapses in judgment."

114. Ronald Wiener, a partner in the Tax Department, wrote in his 1987 evaluation that Associate G "is sometimes too wish-washy and immature; at other times he takes a very extreme 'hard-nosed' and confrontational approach. He needs to be more consistently firm and businesslike and in control."

115. Associate G was admitted to partnership in February 1988.

## (8) Male Associate H

116. Mr. Arbittier wrote in his 1987 evaluation of Associate H:

[Associate H] has really let me down in his handling of a case for General Electric Pension Trust. He missed the crux of the case in the beginning and dragged his feet terribly in getting it back on track.... [Associate H] works very hard, but hard work alone is not enough. I have my doubts that he will ever be anything but a helper who does what he is told adequately but with no spark.

Mr. Arbittier wrote that Associate H was trying "to change my view of him and I am giving him a second chance. He [has] brains. Maybe he can change." Mr. Arbittier also called Associate H "phlegmatic, diffident, nonassertive and unimaginative," and in 1988 wrote that he was "[not] real strong in legal analysis or in focusing on the key issues (dividing the wheat from the chaff)."

117. In 1989, Mr. Arbittier concluded that Associate H was a "nice guy" who had made improvement; he supported Associate H for partnership. Mr. Arbittier explained Associate H's "redemption"; Associate H told Mr. Arbittier how he had been overworked.

118. Associate H became a partner in February 1990.

119. The plaintiff's analytic skills were assessed in the bottom line memo in her final year as the second highest potential rank, "good," which, according to Wolf, Block standards means: "Displays particular merit on a consistent basis; effective work product and performance; able; talented."

120. The plaintiff was criticized by her supervisors for not being "politic" when she pressed for some matter relating to her personally. Some male associates were criticized on their evaluations for not being assertive.

121. In the magnitude of its complexity, a case may have a senior partner, a younger partner, and an associate(s) assigned to a case. Accordingly, requiring the plaintiff to have the ability to handle on her own any complex litigation within the firm before she was eligible to be a partner was a pretext.

122. Mr. Strogatz, Chairman of the Associates Committee, recalls a discussion, possibly at an Associates Committee meeting, that Ms. Ezold "sees things ... as being in discrimination terms."

123. Mr. Strogatz testified about a memorandum memorializing complaints against Associate X of sexual harassment. Secretaries and paralegals said Associate X had touched them or pestered them. The memorandum states that Mr. Strogatz had arranged to have Arden Resnick, an administrative employee in the personnel department, talk to Associate X in a "low-key manner" about those past incidents, and the memorandum recounted a more recent incident where Associate X had touched and flirted in an unwelcome fashion with a secretary. Mr. Strogatz' memo described the secretary as "afraid."

124. Mr. Strogatz testified that his job was not to determine the truth of the allegations against Associate X; he wrote that he did not believe Associate X's story concerning the incident.

125. Mr. Strogatz also stated that he did not feel that the incident concerning Associate X was relevant to considerations of whether or not the candidate was an acceptable candidate for partnership, and he did not report it to the Associates Committee in its deliberations.

126. Although the plaintiff received consistently outstanding compliments for her relationship with clients, Mr. Strogatz explained his marginal rating of Ms. Ezold on this aspect was not based on any facts, but was based on his view that a "prima donna" such as Ms. Ezold would probably not be very good with dealing with clients.

127. In the plaintiff's early years at Wolf, Block, she suggested to Mr. Schwartz that an unfairness in case assignment may have occurred because she was female. Mr. Schwartz replied: "Nancy, don't say that around here. They don't want to hear it."

128. The plaintiff was identified as too involved in women's issues by Mr. Schwartz, who wrote in his 1986 evaluation of her that "her judgment can be clouded by over sensitivity to what she misperceives as women's issues." That evaluation was submitted in the ordinary course to the Associates Committee and was discussed by the Associates Committee. Mr. Rosoff testified that he reviewed Mr. Schwartz' evaluation during his review of the Associates Committee's decision on Ms. Ezold, and noted that comment concerning women's issues as he reviewed her file.

129. Mr. Schwartz recalled Ms. Ezold's expression of concern for paralegals employed by the defendant as a "women's issue." The plaintiff had discussed with Mr. Schwartz complaints by paralegals that they were not paid for overtime hours, for work at night or on weekends. Virtually all of the litigation paralegal staff was female.

130. The defendant asserted that Ms. Ezold had misperceived the problems of the virtually all female paralegal staff as a "women's issue." Mr. Fiebach, however, stated that he brought up the issue of attorneys working part-time at Wolf, Block, which was "well known to be a women's issue." Mr. Strogatz stated that Mr. Fiebach was *not* using bad judgment in raising that question as a women's issue. Ms. Ezold's characterization of matters affecting largely female groups as "women's issues" was evaluated differently.

131. The fact that a male associate had engaged in sexual harassment of female employees at the Firm was seen as insignificant, not worthy of mention to the Associates Committee in its consideration of the male associate for partnership. This de-

spite the fact that "integrity" is a minimal requirement for partnership at the Firm according to the testimony of members of the Associates Committee.

132. The plaintiff was criticized for being "very demanding" and was expected by some members of the Firm to be nonassertive and acquiescent to the predominately male partnership. Her failure to accept this role was a factor which resulted in her not being promoted to partner. However several male associates who had been evaluated negatively for *lacking* sufficient assertiveness in their demeanor *were* made partners.

133. Mr. Kopp, Chairman of the Executive Committee, offered Ms. Ezold a partnership in one year if she took over the Domestic Relations Division of the Litigation Department. It was the history of the Firm that the recommendation of the Executive Committee of an associate for admission to partnership was followed without exception.

134. Before Ms. Ezold could be admitted to partnership, she would have to serve an additional year as an associate. The additional year was not for purposes of giving any additional training or experience. Accordingly, the Chairman of the Executive Committee was satisfied that in 1988 the plaintiff had all the requisites to be a member of the Firm at that time.

135. Gender was a determining factor in the failure of the Firm to promote the plaintiff to partnership in 1989.

## CONSTRUCTIVE DISCHARGE

136. On October 18, 1988, the Chairman of the Litigation Department, Mr. Davis, and two members of the Associates Committee, Arthur Block and Norman Goldberger, met with Ms. Ezold and advised her that she would not be recommended for admission as a regular partner effective February 1, 1989. She was told that too many partners did not believe she had sufficient legal analytical ability to handle complex legal issues. However, they also emphasized to her that the Firm very much wanted her to stay.

137. On November 16, 1988, Ms. Ezold met with Mr. Kopp, Chairman of the Executive Committee, who told her that the Executive Committee would not be recommending to the partnership that she be admitted as a partner effective February 1, 1989. However, Mr. Kopp told her that the two partners who had handled the Firm's domestic relations work (David Hofstein and Judith Widman) had announced their decision to leave the Firm several days earlier, and the immediate staffing need in this practice created by their impending departure enabled him to offer her a position which had not been anticipated previously. He told Ms. Ezold that, in light of the particular skills that the Executive Committee had been told that she possessed, he believed she would be well-suited and well-qualified to head up the Firm's domestic relations practice (which was part of the Litigation Department), and if she agreed to do so, he promised that she would be made a regular partner in one year.

138. In deciding to make the domestic relations partnership offer to Ms. Ezold, Mr. Kopp took into consideration the fact that he believed the legal issues which arise in the domestic relations matters handled by Wolf, Block are generally not as complex as those which arise in commercial litigation matters. He also took into consideration the fact that Wolf, Block had an immediate and pressing need to fill the vacuum which would soon be created by the impending departure of Mr. Hofstein and Ms. Widman.

139. Ms. Ezold told Mr. Kopp that her reaction to the domestic relations partnership offer was negative. Mr. Kopp told her that even if she did not accept that offer, the Firm nevertheless wanted her to stay, and she could continue doing the same type of general litigation work she had done in the past and would receive a substantial increase in salary.

140. Subsequent to her meeting with Mr. Kopp, Ms. Ezold did speak with Mr. Magarity, Mr. Schwartz and Mr. Davis concerning the domestic relations partnership offer, and none of them told her that they

believed that this offer was inappropriate or that acceptance of it would be harmful to her career.

141. Shortly after her meeting with Mr. Kopp, Ms. Ezold had a couple of meetings with Mr. Rosoff to discuss the domestic relations partnership offer and her future prospects for partnership if she declined that offer. Mr. Rosoff told her that Wolf, Block operates on a consensus basis with respect to partnership admission decisions, and a number of partners did not believe that she had sufficient legal analytical ability to handle complex legal issues. He urged her to accept the domestic relations partnership offer and told her that acceptance of that offer would not preclude her from also handling general litigation matters. Ms. Ezold rejected the domestic relations offer, but told Mr. Rosoff she would be willing to head up the domestic relations practice for up to one year. However, Mr. Rosoff told her the Firm was not interested in having her head up the domestic relations practice merely on a short-term basis.

142. Mr. Rosoff reiterated to Ms. Ezold that the Firm wanted her to stay and told her she "could stay as long as she wanted." He told her that although he could not assure her of a partnership in the future if she declined the domestic relations partnership offer, she would be considered for partnership in the future. He also told her that she would receive substantial pay increases beginning in the following July, when semi-annual raises are customarily given to the Firm's associates, but would not give her a pay raise that was then being given to the other members of her class.

143. The domestic relations practice at Wolf, Block was formerly headed by a male (Mr. Hofstein), and a number of different male partners handled domestic relations matters prior to the time Mr. Hofstein came to the Firm. Domestic relations matters are now handled by two of Wolf, Block's senior male partners (Gerald McConomy and Anthony Minisi).

144. The domestic relations practice at Wolf, Block is part of the Litigation Department, and Ms. Ezold admitted that the Firm's domestic relations lawyers "went into court probably the same or a little more" than the other lawyers in the Litigation Department.

145. Ms. Ezold admitted that she did not consider her working conditions at Wolf, Block to be "intolerable" prior to the January 24, 1989 partnership vote.

146. No partner at Wolf, Block told Ms. Ezold that the Firm wanted her to leave.

147. Ms. Ezold was not harassed, belittled or otherwise pressured to leave Wolf, Block.

148. None of the cases that Ms. Ezold was working on at the time of the January, 1989 partnership vote were taken away from her or re-assigned, and Mr. Davis continued to assign her new cases. Ms. Ezold admitted that she remained "busy" and "fully occupied" after the partnership decision.

149. Ms. Ezold tendered her resignation in May, 1989 after she had secured higher-paying employment as President of BES Environmental Specialists (a Wolf, Block client) and an "Of Counsel" position with the law firm of Rosenthal and Ganister because she reasoned that her advancement at the Firm had reached a plateau.

150. Ms. Ezold quit working at Wolf, Block on June 7, 1989.

151. Ms. Ezold's working conditions at Wolf, Block were not intolerable, and a reasonable person in her position would not have felt compelled to leave.

## CONCLUSIONS OF LAW

■ 1. The plaintiff has fully complied with the administrative prerequisites for Title VII litigation. 42 U.S.C. § 2000e–5.

2. Under Title VII, the burdens and order of proof are as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should

the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Chipollini v. Spencer Gifts,* 814 F.2d 893, 897 (3d Cir.1987) (quoting *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)); *see also Roebuck v. Drexel University,* 852 F.2d 715, 731 (3d Cir.1988).

3. Therefore, a plaintiff in a sex discrimination case can establish a prima facie showing of promotion discrimination by demonstrating that she is a member of the protected class, that she was qualified for the position, that she was not promoted into a job for which she was qualified, and that the position was given to a male. See *Dillon v. Coles,* 35 FEP Cases 1239, 1242 (E.D.Pa.1983), *aff'd,* 746 F.2d 998 (3d Cir. 1984).

4. A plaintiff's burden of proof at the prima facie stage is easily met. *See Bhaya v. Westinghouse Electric Corporation,* 832 F.2d 258, 260 (3d Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989), *citing Massarsky v. General Motors Corp.,* 706 F.2d 111 (3d Cir.1983).

5. A plaintiff need not demonstrate on her prima facie case of promotion discrimination that she was the most qualified, but only that she fell in the general range of those considered by a defendant for promotion. *See Easley v. Empire, Inc.,* 757 F.2d 923, 930 n. 8 (8th Cir.1985).

6. The plaintiff here has made a prima facie showing of promotion discrimination. Her evaluations by the partners who worked most closely with her, and the bottom line memo which summarizes her reviews, establish her qualification for partnership at Wolf, Block. Several male associates with lesser evaluations were made partners.

7. After a plaintiff has established a prima facie case, the burden of going forward then shifts to the defendant "to dispel the adverse inference by articulating 'some legitimate, nondiscriminatory reason for the employee's rejection.'" *Duffy v. Wheeling Pittsburgh Steel,* 738 F.2d 1393, 1395 (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984), *quoting Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

8. A Title VII defendant's articulated reasons for the adverse employment decisions must be reasonably clear and specific if the defendant is to succeed in rebutting plaintiff's prima facie showing of discrimination. *See Burdine,* 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

9. If the defendant succeeds in articulating a legitimate nondiscriminatory reason for its decisions, the plaintiff then "must have the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision ... [she] may succeed in this either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095 (citations omitted).

10. "A showing that a proffered justification is pretextual is itself *equivalent* to a finding that the employer intentionally discriminated." *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1396 (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984), *citing McDonnell–Douglas v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *see also Chipollini,* 814 F.2d at 900. Pretext may be shown through the presentation of indirect or circumstantial evidence, or evidence that demonstrates inconsistencies or implausibilities in the employer's proffered reasons for its employment action. *See Chipollini,* 814 F.2d at 899–900.

11. Ms. Ezold has established that the defendant's purported reasons for its conduct are pretextual. The defendant promoted to partnership men having evaluations substantially the same or inferior to the plaintiff's, and indeed promoted male

associates who the defendant claimed had precisely the lack of analytical or writing ability upon which Wolf, Block purportedly based its decision concerning the plaintiff. The defendant is not entitled to apply its standards in a more "severe" fashion to female associates. *See Green v. United States Steel Corp.*, 481 F.Supp. 295, 313 (E.D.Pa.1979) (policy of rejecting applicants for "material misrepresentations" must be applied alike to all races); *Walker v. Robbins Hose Co.*, 465 F.Supp. 1023, 1035 (D.Del.1979). Such differential treatment establishes that the defendant's reasons were a pretext for discrimination. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282–83, 96 S.Ct. 2574, 2579–80, 49 L.Ed.2d 493 (1976).

12. Other instances of conduct by the defendant Firm toward Ms. Ezold support the conclusion that the plaintiff was treated differently because of her gender. Ms. Ezold was evaluated negatively for being too involved with women's issues in the Firm, specifically her concern about the treatment of paralegals. Mr. Fiebach, a member of the Firm, was not reproached for raising the issue of part-time attorneys, which he himself characterized as a "women's issue." In addition, the fact that a male associate had engaged in sexual harassment of female employees at the Firm was seen as insignificant and not worthy of mention to the Associates Committee in its consideration of that male associate for partnership. Ms. Ezold was also evaluated negatively for being "very demanding," while several male associates who were made partners were evaluated negatively for *lacking* sufficient assertiveness in their demeanors. Finally, Ms. Ezold was the target of several comments demonstrating the defendant's differential treatment of her because she is a woman.

## CONSTRUCTIVE DISCHARGE

13. In order to establish constructive discharge, the plaintiff must establish that the employer knowingly permitted conditions of discrimination so intolerable that a reasonable person would feel compelled to resign. *See Spangle v. Valley Forge Sewer Authority*, 839 F.2d 171, 173

(3d Cir.1988), *citing Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 888 (3d Cir. 1985).

14. Constructive discharge cannot be based upon the employee's subjective preference for one position over another. *See Jett v. Dallas Independent School Dist.*, 798 F.2d 748, 755 (5th Cir.1986), *aff'd in part, remanded in part*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Kelleher v. Flawn*, 761 F.2d 1079 (5th Cir. 1985); *Neale v. Dillon*, 534 F.Supp. 1381, 1390 (E.D.N.Y.), *aff'd*, 714 F.2d 116 (2d Cir.1982).

15. A denial of promotion, even if discriminatory, does not alone suffice to establish constructive discharge. *See Nobler v. Beth Israel Medical Center*, 702 F.Supp. 1023, 1031 (S.D.N.Y.1988).

16. A reasonable person in Ms. Ezold's position would not have deemed her working conditions to be so intolerable as to feel compelled to resign.

## ORDER

AND NOW, this 27th day of November, 1990, in accordance with the foregoing findings of fact and conclusions of law, it is hereby ORDERED:

(1) As to the Plaintiff's claim that the Defendant refused to promote the Plaintiff to partner on the basis of her gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., judgment is entered in favor of the Plaintiff, Nancy O'Mara Ezold, and against the Defendant, Wolf, Block, Schorr and Solis–Cohen;

(2) As to the Plaintiff's claim that the Defendant constructively discharged the Plaintiff by creating intolerable working conditions that compelled the Plaintiff to resign, judgment is entered in favor of the Defendant, Wolf, Block, Schorr and Solis–Cohen, and against the Plaintiff, Nancy O'Mara Ezold.